**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

– – – – – – – – – – – – – – – – – – – – – – – – – – – –X

Safani Gallery, Inc.,                                   :

                       Plaintiff,          :          Case No. 19-cv-10507

            -against-                :

The Italian Republic,                                  :

                  Defendant.        :

                                  :

                                  :

– – – – – – – – – – – – – – – – – – – – – – – – – – – –X

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

AMINEDDOLEH & ASSOCIATES LLC

43 West 43rd Street, Suite 171
New York, New York 10036
Telephone (212) 709-8149

Attorneys for Defendant,
The Italian Republic

Table of Contents

Preliminary Statement .................................................................................................. 1

Procedural History ....................................................................................................... 1

Facts .............................................................................................................................. 2

Argument ...................................................................................................................... 5

I.       THE COMPLAINT MUST BE DISMISSED DUE TO LACK OF SUBJECT MATTER JURISDICTION
         ............................................................................................................................. 5

         A.       The Foreign Sovereign Immunity Act is the sole basis for jurisdiction over a foreign
                  sovereign ................................................................................................. 5

         B.       Jurisdiction is a threshold question ......................................................... 6

         C.       None of the FSIA's exceptions apply here .............................................. 7

                  1.       There was no commercial activity taken by Italy; the only act by the sovereign was
                           providing a tip to a U.S. prosecutor's office about a missing object ....................... 7

                           a.       Policing a nation's cultural heritage is sovereign, not commercial, activity 9

                           b.       Precedent dictates that the nature of Italy's conduct was public or
                                    sovereign in nature and could not have been committed by a private party
                                    .................................................................................................... 11

                           c.       The Second Circuit has ruled that regulation of cultural heritage is
                                    "archetypal sovereign activity." ................................................... 12

                           d.       Italy holds cultural heritage in trust for its citizens and the world ............. 13

                           e.       Italy's tip to a law enforcement agency did not have a direct effect in the
                                    United States ................................................................................ 14

                  2.       The Republic of Italy never waived its sovereign immunity .................................. 17

II.      PLAINTIFF NAMED THE WRONG PARTY IN THIS SUIT; THE ACTS ALLEGED WERE NOT
         TAKEN BY A FOREIGN NATION, BUT BY A U.S. LAW ENFORCEMENT AGENCY .................... 18

III.     UPON DISMISSAL FROM THIS COURT, N.Y. SUPREME COURT IS AVAILABLE TO SETTLE
         THIS CONTROVERSY ......................................................................................... 20

IV.   IT IS AGAINST PUBLIC POLICY TO REQUIRE FOREIGN SOVEREIGS TO DEFEND
      THEMSELVES IN U.S. COURTS FOR PROVIDING INFORMATION TO LAW ENFORCEMENT
      AGENCIES ........................................................................................................................... 22

      A.   It is essential for foreign nations to communicate with law enforcement agencies ............. 22

      B.   Silencing sovereigns will ultimately harm the art market and consumers in N.Y. ............... 23

Conclusion .................................................................................................................................... 25

**Table of Authorities**

CASES:

*Abelesz v. Magyar Nemzeti Bank*,
692 F.3d 661 (7th Cir. 2012) ............................................................................................... 18

*Alberti v. Empresa Nicaraguense De La Carne*,
705 F.2d 250 (7th Cir. 1983) ............................................................................................... 12

*Altmann v. Republic of Austria*,
317 F.3d 954 (2002) ............................................................................................................... 6

*Angiolillo v. Christie's, Inc.*,
64 Misc. 3d 500, 103 N.Y.S.3d 244 (N.Y. Sup. Ct. 2019) ................................................ 24

*Anglo-Iberia Underwriting Management v. P.T. Jamsostek*,
600 F.3d 171(2d Cir. 2010) .................................................................................................. 14

*Antares Aircraft, LP v. Federal Republic of Nigeria*,
999 F.2d 33 (1993) ................................................................................................................ 16

*Aquinda v. Texaco, Inc.*,
175 F.R.D. 50 (S.D.N.Y. 1997) ............................................................................................ 17

*Argentine Republic v. Amerada Hess Shipping Corp.*,
488 U.S. 428 (1989) ............................................................................................................... 5

*Baez v. Hennessy*,
853 F.2d 73 (2d Cir. 1988) ................................................................................................... 20

*Bakalar v. Vavra*,
619 F. 3d 136 (2d Cir. 2010) ............................................................................................... 24

Barapind v. Government of Republic of India,
844 F.3d 824 (9th Cir. 2016) ............................................................................................... 18

*Barnet et al. v. Ministry of Culture and Sports of the Hellenic Republic*,
No. 19-2171, 2020 WL 3053385 (2d Cir. Jun. 9, 2020) ................................ 10, 11, 12, 13, 14

*Cargill Int'l. S.A. v. M/T Pavel Dybenko*,
991 F.2d 1012 (2d Cir. 1993) ............................................................................................ 7, 18

*Chettri v. Nepal Rastra Bank*,
834 F.3d 50 (2d Cir. 2016) ......................................................................................... 10, 15, 20

*Crespo v. Rivera*,
No. 16 CIV. 708 (PGG), 2018 WL 4500868 ..................................................................................20

*de Cespel v. Republic of Hungary*,
714 F.3d 591 (D.C. Cir. 2013) .................................................................................................11

*De Sanchez c. Banco Cent. de Nicaragua*,
770 F.2d 1385 (5th Cir. 1985) ................................................................................................11

*Decor by Nikkei Int'l, Inc. v. Fed. Republic of Nigeria*,
497 F. Supp. 893 (S.D.N.Y. 1980) .........................................................................................15

*Drexel Burnham Lambert Grp. Inc. v. Comm. of Receivers for Galadari*,
12 F.3d 317 (2d Cir. 1993) .....................................................................................................17

*Ezeiruaku v. Bull*,
617 F. App'x 179 (3d Cir. 2015) .............................................................................................10

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*,
905 F.2d 438 (D.C. Cir. 1990) .................................................................................................6

*Garb v. Republic of Poland*,
440 F.3d 579 (2d Cir. 2006) .............................................................................................12, 13

*Guggenheim v. Lubell*,
77 N.Y.2d 311 (1991) .............................................................................................................24

*Guirlando v. T.C. Ziraat Bankasi A.S.*,
602 F.3d 69 (2d Cir. 2010) .....................................................................................................15

*Hilao v. Estate of Marcos (In re Estate of Marcos Human Rights Litig.)*,
94 F.3d 539 (9th Cir. 1996) ....................................................................................................11

*Jacubovich v. Israel*,
No. 19-2970-CV, 2020 WL 2769094 (2d Cir. May 28, 2020) ..................................................7

*Kern v. Oesterreichische Elektrizitaetswirtschaft Ag*,
178 F. Supp. 2d 367 (S.D.N.Y. 2001) ......................................................................................7

*Kunstsammlungen zu Weimar v. Elicofon*,
678 F.2d 1150 (2d Cir. 1982) .................................................................................................25

*Kunstsammlungen zu Weimar v. Elicofon*,
536 F.Supp. 829 (E.D. N.Y. 1981) .........................................................................................24

*Malewicz v. City of Amsterdam,*
362 F. Supp 2d 298 (D.D.C. 2005) ............................................................................8, 9, 11

*Martin v. Republic of South Africa,*
836 F.2d 91 (2d Cir. 1987)) ....................................................................................... 15

*NML Capital Ltd. v. Republic of Arg.,*
680 F.3d 254 (2d Cir. 2012) .......................................................................................9

*NML Capital, Ltd. v. Banco Central de la Republica Argentina,*
652 F.3d 172 (2d Cir. 2011) ...................................................................................... 17

*People v. Museum of Modern Art (In re: Grand Jury Subpoena Duces Tecum),*
93 NY2d 729 (1999).............................................................................................21, 22

*People of the State of New York v. Weiner,*
SCI-05191-2016 (Sup. Ct. Dec. 21, 2016) .................................................................. 23

*Petersen Energia Inversora v. Argentine Republic,*
895 F.3d 194 (2018) ............................................................................................11, 12

*Phoenix Consulting, Inc. v. Republic of Angola,*
216 F.3d 36 (D.C. Cir. 2000) ......................................................................................6

*Republic of Arg. v. Weltover, Inc.,*
504 U.S. 607 (1992)..................................................................................8, 11, 15, 16

*Republic of Aus. v. Altmann,*
541 U.S. 677 (2004)................................................................................................. 22

*Republic of Turkey v. Metropolitan Museum of Art,*
762 F. Supp. 44 (S.D.N.Y. 1990) ............................................................................... 24

*Saudi Arabia v. Nelson,*
507 U.S. 349 (1993)............................................................................6, 9, 10, 12, 14, 15

*Schooner Exchange v. McFaddon,*
11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812) .................................................................5

*Shapiro v. Republic of Bolivia,*
930 F.2d 1013 (2d Cir. 1991).......................................................................................8

*Sisso v. Islamic Republic of Iran,*
448 F.Supp. 2d 76 (D.D.C. 2006) ...............................................................................6

*United States v. An Antique Platter of Gold,*
991 F. Supp. 222 (S.D.N.Y. 1997) aff'd, 184 F.3d 131 (2d Cir. 1999) ...............................9, 23

*United States v. Schultz,*
333 F.3d 393 (2d Cir. 2003), cert. denied, 540 U.S. 1106 (2004) .........................................23

*Verlinden B.V. v. Cent. Bank of Nig.,*
461 U.S. 480 (1983)..............................................................................................................6

*Walker International Holdings Ltd. v. Republic of Congo,*
395 F.3d 229 (5th Cir. 2004)............................................................................................17, 18


STATUTES:

28 U.S.C. § 1330 ...............................................................................................................5, 6

28 U.S.C. §1604 ................................................................................................................5, 6

28 U.S.C. § 1605(a) ...............................................................................................7, 15, 16, 17

Native American Graves Protection and Repatriation Act, Pub. L. 101-601,
25 U.S.C. 3001 et seq., 104 Stat. 3048 ................................................................................23

Art. XXIII, N.Y. Const.: April 20, 1777 ...................................................................................18

N.Y. Penal Code [PL]...............................................................................................................1

C.p.p., art. 57 (1989)...........................................................................................................4, 8


OTHER AUTHORITIES:

*2016 Annual Report from the Office of New York County District Attorney Cyrus R. Vance, Jr.,*
MANHATTANDA, https://www.manhattanda.org/wp-content/uploads/2018/02/2016-Annual-Report.pdf
(last visited Jun. 20, 2020) ................................................................................................19

Art. 9 Costituzione [Cost.] (It.) (official English translation can be found at
https://www.senato.it/documenti/repository/istituzione/costituzione_inglese.pdf) ......................8, 14

Art. 101 Costituzione [Const.] (It.)...........................................................................................4

Art. 117 (s) Costituzione [Cost.] (It.).......................................................................................22

Becky Little, *Why Graverobbers Won't Leave Native American Burial Sites Alone*, HISTORY (Mar. 4, 2019), https://www.history.com/news/native-american-burial-site-theft.....................................23

Brief for the United States as *Amicus Curiae* at *8-9, *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134 (2014) (No. 12-842)...........................................................................................................6

*The Carabinieri TPC*, MINISTERO DELLA DIFESA, http://www.carabinieri.it/multilingua/en/the-carabinieri-tpc (last visited Jun. 20, 2020)......................................................................................................4

CNT §927.....................................................................................................................................................18

DUNCAN CHAPPELL & SASKIA HUFNAGEL, THE PALGRAVE HANDBOOK ON ART CRIME, 13 (2019).................3

Eileen Kinsella, *The Art Loss Register is Entangled in Three Major International Art Disputes*, ARTNET, https://news.artnet.com/art-world/art-loss-register-embroiled-least-three-international-art-disputes-305134 (Jun. 5, 2016) ........................................................................................................................3

Frank Viviano, *Italy's Artifacts Police Wage Global War, Recover 137,000 Objects*, NATIONAL GEOGRAPHIC (Jun. 19, 2015), https://www.nationalgeographic.com/news/2015/06/150618-carabinieri-morgantina-italy-art-theft-antiquities-trafficking/...............................................................................................................................23

H.R. Rep. No. 94-1487 at 16 (1976) .........................................................................................................7

*The Italian Carabinieri Department for the Protection of Cultural Heritage -TPC supports international police cooperation via INTERPOL and UNESCO to stop the illicit trafficking of cultural property*, UNESCO, https://en.unesco.org/mediabank/24813/ (last visited Jun. 20, 2020) ..............................4

*Italy, Properties inscribed on the World Heritage List (55)*, UNESCO, https://whc.unesco.org/en/statesparties/it (last visited Jun. 20, 2020)............................................22

LAURIE RUSH & LUISA BENEDETTINI MILLINGTON, THE CARABINIERI COMMAND FOR THE PROTECTION OF CULTURAL PROPERTY (2015) ..........................................................................................................................................4

Patty Gerstenblith, *Identity and Cultural Property: The Protection of Cultural Property in the United States*, 75 B.U. L. REV. 559, 688 (1995) .........................................................................................14

*Terms and Conditions of Search*, ART LOSS REGISTER, http://www.artloss.com/content/terms-and-conditions-of-search (last visited Jun. 4, 2020).....................3

*Treaties and Agreements*, U.S. DEPT. OF STATE (Mar. 7, 2012), https://2009-2017.state.gov/j/inl/rls/nrcrpt/2012/vol2/184110.htm........................................................24

*White Collar Crime*, MANHATTANDA, https://www.manhattanda.org/our-work/white-collar-crime/ (last visited Jun. 20, 2020).........................19

Defendant, La Repubblica Italiana ("Italy"), respectfully submits this memorandum of law in support of its motion to dismiss the Complaint filed by Safani Gallery of Art ("Plaintiff").

## PRELIMINARY STATEMENT

This case stems from a law enforcement tip sent to the Manhattan District Attorney's Office (the "Manhattan DA" or "DA") by the Arma dei Carabinieri (the "Carabinieri"), a judicial police force in Italy. The tip set forth Italy's national interest in an object originating from within its sovereign borders. This action must be dismissed under the Foreign Sovereign Immunity Act ("FSIA"). In addition, Plaintiff's misunderstanding of the function of the DA's investigative and law enforcement functions in New York County ("N.Y.") reveals that allegations against Defendant were not acts conducted by the sovereign government of Italy, but by U.S. law enforcement. Italy is immune from the jurisdiction of this Court, and thus this matter must be dismissed.

## PROCEDURAL HISTORY

The Head of Alexander ("the Head"), a marble bust, was seized by the Manhattan DA on February 22, 2018, pursuant to a warrant issued by Judge Thomas Farber of the Supreme Court of the State of N.Y., County of N.Y. (the "N.Y. Supreme Court"). On February 27, 2018, the DA informed Plaintiff and opposing counsel of evidence indicating the Head had been stolen. Plaintiff's counsel requested that the DA investigate these claims, which it proceeded to do over the following months while providing counsel with interim summaries. In July 2018, the DA concluded its investigation, determining that is investigation supported Italy's claim and that the Head constituted stolen property under N.Y. Penal Code ("PL"). The grounds for this determination are explained in both the Turnover Application submitted by DA Cyrus Vance in July 2018 and Reply to Application for Turnover Order, *In the Matter of the Safani Gallery Inc. Search Warrant*, No. GJF2017-11212F (Sup. Ct. Nov. 13, 2019) ("Applic.") (attached as Exhibit A). On December 2, 2018, Plaintiff opposed the DA's application *via* a 44-page motion outlining various allegations, including violations of due process and N.Y. Supreme Court's lack of jurisdiction. The DA replied on January 3, 2019, stating that all

supporting evidence was made available to Plaintiff and the warrant-issuing court may determine the disposition of the Head. On November 12, 2019, Plaintiff filed its Complaint ("Compl.) before this Court. On November 26, 2019, Judge Farber stayed the proceedings in N.Y. Supreme Court pending the outcome of the instant case. Plaintiff had ample opportunity to defend itself in court, and it is now forum-shopping in order to obtain a more favorable outcome. However, this Court does not have jurisdiction over Defendant under the applicable law, the FSIA.

*FACTS*

This matter stems from a criminal investigation into and seizure of a marble antiquity. Although identified for sale by Plaintiff gallery as "Alexander the Great," that is a misnomer because the bust most likely depicts a Parthian Barbarian. However, for consistency of language, we use "the Head" in this filing.

The Head was discovered at the Roman Forum in Italy during an excavation sponsored by Italy. The forum is acknowledged as one of the most significant archaeological sites in the Western world. After its excavation, the Head was transferred to the Antiquarium Forense (the "Museum"), a museum established by Italy. The Head, inventory number 5862, along with an identifying photo, was listed as "perdute" ("missing") during an official inventory of the Museum conducted in November 1960. The Museum never sold, deaccessioned, or abandoned ownership of it. Rather, the Museum maintained records of the Head in its archive.

Through circumstances still unknown, the missing Head ended up in the collection of Hagop Kevorkian and was sold by Sotheby's in 1974. This was prior to the wide availability of auction catalogs, which are now publicly accessible online; thus, it would have been nearly impossible for the Museum to have discovered the sale and make an ownership claim. Compounding this problem, there was no provenance (ownership history) provided in the sale, and therefore Italy was not listed as the country of origin, making it even more unlikely that the Museum could have learned of it. Moreover, the Head was mislabeled as a "[m]arble head fragment of Apollo." Applic. at ¶26. The Museum had no way of predicting where the Head

2

would resurface after its disappearance. Tellingly, the Head was consigned by Kevorkian along with another object identified as missing during the same museum inventory. Applic. at ¶26.

The Head resurfaced at Sotheby's in 2011, with no information on where it had been during the intervening decades. Once more, it was nearly impossible for Italy to discover its presence because it was falsely identified as "Alexander," and its origin was again unlisted. According to Plaintiff, it purchased the Head from Classical Galleries LTD, which had received it from a "Foundation." Compl. at ¶8. Plaintiff purportedly purchased the Head in the United Kingdom and alleges that it completed due diligence by hiring an unnamed expert to inquire into its provenance, but that process was not described by Plaintiff. Compl. at ¶10. Plaintiff also relies on a letter by Art Loss Register ("ALR") to support these claims.

ALR is a private company that checks its limited database of stolen art when a potential buyer inquires about a sale. However, a provenance search by ALR is never definitive. ALR acknowledges that its searches merely reduce the chance of acquiring stolen items, and its results are not always accurate. Its terms and conditions state that clients "cannot solely rely on the results of any search or enquiry by the ALR either: i) as sufficient evidence of due diligence and/or good faith on the part of the Client in investigating the provenance of a catalogued item; or ii) to excuse any failure on the part of the Client to properly act with due diligence and/or good faith in any such investigation."[1] ALR's results are also accompanied by a letter stating that the item has not been listed as stolen or missing to the best of ALR's knowledge. It has been publicly noted that collectors misuse the ALR to assert good faith when dealing with suspect items.[2]

---

[1] Terms and Conditions of Search, ART LOSS REGISTER, http://www.artloss.com/content/terms-and-conditions-of-search (last visited Jun. 4, 2020).

[2] A leading publication reported that ALR is not "reliable," noting instances of misuse of information or lack thereof. ALR's stated, "Our certificates make clear that not all thefts are reported to us, and a search with the Art Loss Register cannot excuse the undertaking of further due diligence if such an exercise is appropriate." Eileen Kinsella, The Art Loss Register is Entangled in Three Major International Art Disputes, ARTNET, https://news.artnet.com/art-world/art-loss-register-embroiled-least-three-international-art-disputes-305134 (Jun. 5, 2016); "ALR has been criticised in the past for issuing certificates that an object was not registered on its database without querying the provenance or origin…" DUNCAN CHAPPELL & SASKIA HUFNAGEL, THE PALGRAVE HANDBOOK ON ART CRIME, 13 (2019).

Against all odds, in early 2018 a Museum employee recognized the Head as an item missing from storage. She immediately notified other Museum employees who contacted the Carabinieri, a judicial police that is a separate branch from the government under the Italian Constitution.[3] The Carabinieri's responsibilities are established by the Italian Code of Criminal Procedure. C.p.p., art. 57 (1989). Under this Code, the Carabinieri must take note of crimes that have been committed, prevent them from having any further consequences, search for perpetrators, and carry out all necessary acts to collect related evidence and information. *Id.* at art. 55. In fact, there is a specialized unit of the Carabinieri, Tutela Patrimonio Culturale (the "TPC") tasked with protecting cultural property;[4] it has gained international recognition for its work protecting heritage.[5] The TPC also carries out activities during peacekeeping operations to protect heritage during conflict.[6] The TPC made the tip about the Head to the U.S authorities.

The Carabinieri investigation found the Museum's claim to be meritorious, pursuant to its judicial police functions under Italian law. As part of its mutual international cooperation, it promptly informed the DA of the Head's history, its ownership by Italy *via* patrimony laws (laws that nationalize cultural heritage and provide a framework for sale and export), and its location within the DA's jurisdiction. Upon the DA's receipt of the Carabinieri's tip, it investigated the claims in accordance with its standard procedure. The DA conducted a thorough investigation that has been well-documented in court filings. Assistant DA Matthew Bogdanos' Affirmation ("Affirmation")[7] at ¶5. The informant had no role in, or any power over, the DA's subsequent investigation or actions; in fact, "in order to avoid jeopardizing the integrity of any investigation,

---

[3] In Italy, the judicial branch is autonomous; justice is administered in the name of the people and judges are subject only to the law. Art. 101 Costituzione [Const.] (It.) (official English translation can be found at https://www.senato.it/documenti/repository/istituzione/costituzione_inglese.pdf).

[4] The Carabinieri TPC, MINISTERO DELLA DIFESA, http://www.carabinieri.it/multilingua/en/the-carabinieri-tpc (last visited Jun. 20, 2020).

[5] See e.g., LAURIE RUSH & LUISA BENEDETTINI MILLINGTON, THE CARABINIERI COMMAND FOR THE PROTECTION OF CULTURAL PROPERTY (2015).

[6] The Italian Carabinieri Department for the Protection of Cultural Heritage -TPC supports international police cooperation via INTERPOL and UNESCO to stop the illicit trafficking of cultural property, UNESCO, https://en.unesco.org/mediabank/24813/ (last visited Jun. 20, 2020).

[7] Affirmation attached as Exhibit B.

[the DA] directs representatives of foreign governments not to interfere in the investigation or to communicate with any of the parties." Affirmation at ¶4. Neither the Museum nor the Carabinieri ever communicated with the Plaintiff concerning the missing Head. Their only communication with the DA was the initial notice pursuant to its judicial police functions emanating from the Italian Constitution and Italian Criminal Code.

The DA, on its own accord, seized the Head in February 2018. The DA and Plaintiff engaged in fact-finding, leading the DA to file a Turnover Application in July 2019. Plaintiff filed this civil action in November 2019. Immediately after filing suit, Plaintiff asked the N.Y. Supreme Court to stay the criminal proceedings. Justice Farber granted the stay, contingent upon this Court finding jurisdiction. Tr. of Oral Argument at 51:10-52:5, *In the Matter of the Safani Gallery Inc. Search Warrant*, No. GJF2017-11212F (Sup. Ct. Nov. 13, 2019)[8] ("*Tr.*"). It is well-settled that jurisdiction over a foreign sovereign can only be established through the FSIA. Unless a statutory exception applies, the case must be dismissed. These exceptions are limited and none are applicable here; thus dismissal must be granted.

## ARGUMENT

### I.     THE COMPLAINT MUST BE DISMISSED DUE TO LACK OF SUBJECT MATTER JURISDICTION

#### A.   The Foreign Sovereign Immunity Act is the sole basis for jurisdiction over a foreign sovereign

This Court lacks subject matter jurisdiction under 28 U.S.C. § 1330 because, as a matter of law and in recognition of grace and comity, the FSIA is "the sole basis for obtaining jurisdiction over a foreign state in [U.S.] courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). For over two centuries, U.S. courts have recognized the importance of upholding sovereign immunity as part of the "perfect equality and absolute independence of sovereigns" and the "common interest impelling them to mutual intercourse, and an interchange of good offices with one another." *Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 137, 3 L.Ed. 287 (1812). Under the FSIA, a foreign state is presumptively immune from

_____

[8] Tr. is attached hereto as Exhibit C.

the jurisdiction of a U.S. court. 28 U.S.C. §1604; *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993). The Supreme Court has consistently held that the structure and text of the FSIA indicate Congress' intention for this statute to be the only means of obtaining jurisdiction over a foreign sovereign. *See Amerada Hess*, 488 U.S. at 439-40. As Plaintiff filed a civil action against Italy in the U.S., this court must apply the FSIA as the sole and exclusive basis for determining whether it has jurisdiction over Defendant. *See id.*

### B.  Jurisdiction is a threshold question

To preserve the full scope of sovereign immunity under the FSIA, this Court must make the critical preliminary determination of its own jurisdiction as soon as possible. *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 449 (D.C. Cir. 1990). Before any civil action against a foreign state may proceed in a U.S. court, Plaintiff bears the burden of overcoming the FSIA's jurisdictional protections. *Sisso v. Islamic Republic of Iran*, 448 F. Supp. 2d 76, 81 (D.D.C. 2006). To do otherwise would be to frustrate the significance and benefit of a foreign state's entitlement to immunity. 28 U.S.C. §§1330(a), 1604; *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000).

Since the FSIA's enactment in 1976, foreign states have been provided with an explicit presumption of immunity. *See* Brief for the United States as *Amicus Curiae* at *8-9, *Republic of Argentina v. NML Capital, Ltd.,* 573 U.S. 134 (2014) (No. 12-842). The FSIA provides a general grant of immunity, and specifies limited enumerated exceptions. A court must satisfy itself that one of the exceptions applies as a threshold matter because subject matter jurisdiction will depend upon this finding. *Verlinden B.V. v. Cent. Bank of Nig.*, 461 U.S. 480, 493-94 (1983). A federal court cannot hear claims against sovereign nations unless they fall within one of these enumerated exceptions. *Altmann v. Republic of Austria*, 317 F.3d 954, 962 (2002) (quoting *Verlinden,* 461 U.S. at 497). Accordingly, this Court must determine the question of subject matter jurisdiction as a threshold matter to ensure that it does not unfairly deprive Italy of the immunity to which it is entitled. As discussed below, granting jurisdiction would be in contravention of the FSIA and stand in opposition to long-standing policies concerning foreign relations.

### C.   None of the FSIA's exceptions apply here

A plaintiff bears the burden of establishing that one of the enumerated exceptions to the FSIA applies. *See Kern v. Oesterreichische Elektrizitaetswirtschaft Ag*, 178 F. Supp. 2d 367, 373 (S.D.N.Y. 2001) (citing *Cargill Int'l. S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993)). The Complaint does not specify which exception applies. However, the language used suggests that Plaintiff intends to fabricate jurisdiction under the commercial activity exception. Compl. at ¶6. That language is taken directly from the third prong of the commercial activity exception: "The acts by Italy complained of in this action were taken outside of the United States, were taken in connection with a commercial activity engaged in by Italy, and had a direct effect in the United States." FSIA §1605(a)(2) (the "commercial activity" exception) provides that a foreign state is not immune from suit in any case:

> in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere; or **upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States**. (emphasis added).

This exception, like all of the FSIA's exceptions, must be narrowly construed. *Jacubovich v. Israel*, No. 19-2970-CV, 2020 WL 2769094, at *1 (2d Cir. May 28, 2020). The only act alleged in the Complaint was that Italy informed the competent U.S. law enforcement agency about the missing Head. This is the gravamen of the suit and will be examined accordingly.

### 1.   There was no commercial activity taken by Italy; the only act by the sovereign was providing a tip to a U.S. prosecutor's office about a missing object.

Given that the FSIA does not provide a list of activities qualifying as "commercial," courts determine this on a case-by-case basis. However, Congress contemplated examples of relevant conduct, including: selling items, leasing property, borrowing money, investing, import-export transactions, and business torts within the U.S. H.R. Rep. No. 94-1487 at 16 (1976). These activities all imply a sustained pattern of conduct. "Commercial activity" has been defined by courts as either a regular course of commercial conduct, or a

particular commercial transaction or act, such as a loan or a transaction. Isolated acts tend to fall under the commercial activity exception only when relating to contractual matters, such as a contract designating the U.S. as the place of performance. *See Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607 (1992); and *Malewicz v. City of Amsterdam*, 362 F. Supp 2d 298, 304 (D.D.C. 2005) (finding commercial activity when a sovereign loaned artwork to museums in the U.S. for a commercial exhibition). When analyzing a sovereign's behavior, the Second Circuit looks to "the particular conduct giving rise to the claim," which must be "part of commercial activity having substantial contact with the United States." *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1018 (2d Cir. 1991). Here, Italy performed a single act of communication that was purely sovereign in nature and that lacks substantial contact with the U.S.

The instant case is not based upon commercial activity. According to the plain language definition of "commercial activity," it is unreasonable to classify providing information to a law enforcement agency as commercial. Rather, the communication in this case was sovereign because it constitutes policing activity. Here, neither the Museum nor the Carabinieri performed any type of recognized commercial activity, nor did they engage in any regular or commercial transaction or act in relation to the Head.

The **only** acts alleged in Complaint were that (1) the Museum, an agent of Italy, reported seeing the missing Head with Plaintiff (Compl. at ¶21), and (2) the Carabinieri reported the tip to U.S. authorities. Compl. at ¶22. Regarding the first allegation, the Museum's single act of reporting to the Carabinieri was not commercial by any stretch of the imagination. It was a routine communication sent to a law enforcement agency in furtherance of Italy's constitutional obligation to do so as a custodian of a sovereign's cultural heritage. Art. 9 Costituzione [Cost.] (It.). The Museum simply provided information to policing authorities; it never communicated with Plaintiff or any other commercial entity to discuss a transaction. Regarding the second allegation, the Carabinieri did not engage in commercial activity, as this act was taken as a part of its legal duties to protect national patrimony and investigate criminal acts. C.p.p., art. 57 (1989). Furthermore, the act originated in Italy with governmental and judicial actors; this is clearly of a sovereign nature and does

not go to the gravamen of the suit due to intervening acts (discussed below). The Carabinieri, as a judicial policing entity, shared information about a missing work with the competent law enforcement authority in N.Y. County. Thus, the acts signaled out by Plaintiff were policing or regulatory in nature, not commercial.

### a. *Policing a nation's cultural heritage is sovereign, not commercial, activity.*

Courts recognize the potential inequity of requiring a sovereign to defend itself in a U.S. court, explaining that the commercial activity exception applies only when the sovereign is engaging in commercial activity and not "conducting itself as a sovereign." *Malewicz*, 362 F. Supp 2d at 310-11. In other words, courts interpret sovereign activity as that in which a sovereign does not conduct itself like a private party. *See Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993). Exercising a sovereign's constitutional policing power by regulating the ownership of national property is not commercial activity. Not a single case in this jurisdiction or any other in the U.S. has found that providing a tip to a policing authority is commercial. Further, Italy's communication to U.S. authorities was sovereign because it concerned property subject to its national patrimony laws. Like other nations with a wealth of cultural artifacts, Italy has a robust system of legal protection for this type of property. Italy has long sought to protect its heritage, with regional patrimony laws predating the Republic of Italy. Since 1902, national patrimony laws in Italy regulate the ownership and police the export of cultural items from Italy. *US v. An Antique Platter of Gold*, 991 F. Supp. 222, 227, n. 25 (S.D.N.Y. 1997) *aff'd*, 184 F.3d 131 (2d Cir. 1999). The application of Italy's national law is a sovereign matter.

In determining the nature of the activity, courts have found that "the relevant inquiry concerns the power that is exercised, rather than the motive for its exercise." *NML Capital Ltd. v. Republic of Arg.*, 680 F.3d 254, 259 (2d Cir. 2012). Here, Italy engaged its police power to investigate the Head, inform proper authorities about its location, and enforce the sovereign's law. Sharing such information with either a domestic or foreign government entity is both ordinary and essential to law enforcement procedures and falls squarely within the established principle that the exercise of police power is sovereign. *Nelson*, 507 U.S. at 361-62.

When a foreign state, through its law enforcement authorities, attempts to recover property that was taken from it and brought to the U.S., such activity is sovereign, not commercial. *See Hilao v. Estate of Marcos (In re Estate of Marcos Human Rights Litig.)*, 94 F.3d 539 (9th Cir. 1996). In *Hilao*, the Filipino government worked to recover cash, fine art, and other property that deposed dictator Ferdinand Marcos looted from the state treasury and brought to the U.S. *Id* at 542. The Ninth Circuit determined that the commercial activity exception did not apply to the Philippines' recovery efforts because the activity was sovereign, not commercial. *Id.* at 546. As the court stated, "a governmental agency of the Philippines is acting under a statutory mandate to recover property allegedly stolen from the treasury. This exercise of police power is a governmental rather than commercial activity, and thus, the commercial-activity exception does not apply." *Id.* at 546. *See also*, *Nelson*, 507 U.S. at 361 ("[A] foreign state's exercise of the power of its police has long been understood for purposes of the restrictive theory as peculiarly sovereign in nature."); *Chettri v. Nepal Rastra Bank*, 834 F.3d 50, 56 (2d Cir. 2016) (concluding that a Nepalese official and state-owned bank that confiscated funds pursuant to an investigation "were acting as government regulators, not private commercial players."); *Ezeiruaku v. Bull*, 617 F. App'x 179, 181 (3d Cir. 2015) (determining that enforcing the law of the United Kingdom by seizing currency for investigation was sovereign activity). This analysis is further supported by the Second Circuit's recent decision in *Barnet et al. v. Ministry of Culture and Sports of the Hellenic Republic*, No. 19-2171, 2020 WL 3053385 (2d Cir. Jun. 9, 2020) ("*Barnet*"), which holds that acts taken by a nation in furtherance of its patrimony laws are sovereign.

As the above cases demonstrate, and as the Supreme Court's decision in *Nelson* and the Second Circuit's decisions in *NML* and *Barnet* emphasize, the key to determining the nature of a foreign state's activity is pinpointing the type of power that the sovereign exercised. Here, the Court must consider the power that Italy exercised (the nation's policing power), and whether private citizens can exercise the same power. The answer is no; private entities absolutely cannot exercise police power or enforce a nation's patrimony laws.

10

### b. Precedent dictates that the nature of Italy's conduct was public or sovereign in nature and could not have been committed by a private party.

The Supreme Court emphasized that courts should examine whether particular actions are the *type* of actions by which private parties engage in "trade and traffic or commerce." *Weltover,* 504 U.S. at 614. The Second Circuit adopted a similar test to the Supreme Court for determining the scope of "commercial" activity. The character of the act is determined by reference to its "nature." *Malewicz*, 362 F. Supp 2d at 314. In *Weltover,* the Supreme Court clarified that sovereign activity cannot be exercised by a private party. 504 U.S. at 607. The Second Circuit also recently held that breach of contract was "precisely the type of activity in which a private player within the market engages," in *Petersen Energia Inversora v. Argentine Republic,* 895 F.3d 194, 205 (2018) (quoting *de Cespel v. Republic of Hungary*, 714 F.3d 591, 599 (D.C. Cir. 2013)). In *Energia*, this Court found that Argentina performed commercial activity through a nationalized oil company that had previously been privatized and breached its contractual obligations under the company's bylaws.

The instant case is vastly different from *Weltover* and *Energia*. The Museum was never privatized, was never managed by a private company, and does not issue financial instruments based upon contractual agreements; these acts are all facially commercial and are regularly executed by private parties. On the other hand, Italy's acts were policing in nature as related to ownership claims under a sovereign patrimony law.

The acts alleged by Plaintiff are not contractual, and they could not have been taken by a private party. Only a state can exercise its policing powers, despite private parties being able to provide crime tips. Furthermore, "[n]ationalizing property is a distinctly sovereign act," and acts corresponding to the enforcement of laws that regulate the ownership and export of nationalized artifacts falls within the sovereign police power. *Barnet,* at *14. In *Hilao*, the court found that even though private citizens can seek to recover stolen property, the Philippines' attempt to recover Marcos' loot constituted sovereign activity. 94 F.3d at 546. Private persons also cannot control a country's foreign exchange, as *De Sanchez c. Banco Cent. de Nicaragua* states, despite being able to stop payment on checks. 770 F.2d 1385, 1392-94 (5th Cir. 1985).

11

What these cases have in common is that they involve a state's uniquely sovereign authority to use police power to protect its sovereign interests. The commercial activity exception does not apply to such conduct.

### c.   The Second Circuit has ruled that regulation of cultural heritage is "archetypal sovereign activity."

The commercial activity exception in the context of antiquities was recently examined by the Second Circuit in *Barnet*, where the appeals court unanimously held that a foreign government's communication concerning its cultural heritage was sovereign. *Barnet* at \*2. There, Greece wrote a letter to an auction house asserting ownership rights and demanded the return of an item for sale. The plaintiffs there claimed that the communication qualified as commercial activity because it allegedly intervened with a sales transaction. The court disagreed, holding that the assertion of rights in connection with a law nationalizing property is sovereign activity, not commercial, despite the fact that sending a letter was an act that a private party could perform. *Id*. at \*2. The court stated that the main issue at hand was inextricably bound up with sovereign activity, and Greece sending the letter was therefore not commercial. *Id*. at \*17. The court characterized it as "archetypal" sovereign activity, denying jurisdiction over the sovereign nation in the district court. *Id*. at \*4.

The Second Circuit explained its decision by reasoning that nationalizing property is a "distinctly sovereign act," as is enforcing laws regulating the ownership and export of nationalized artifacts. *Id.* at \*14 (citing *Nelson*, 507 U.S. at 362; *Garb v. Republic of Poland*, 440 F.3d 579, 586 (2d Cir. 2006)); *Alberti v. Empresa Nicaraguense De La Carne*, 705 F.2d 250, 254 (7th Cir. 1983); and *Petersen*, 895 F.3d at 201). The Second Circuit notes that this is policing conduct, and that the power to act through police "has long been understood ... as peculiarly sovereign in nature." *Barnet* at *14*. Not only is the enforcement policing, and thus sovereign activity, but it is undeniable that only a foreign sovereign can claim ownership over an item pursuant to a patrimony law. In *Barnet*, the court notes that plaintiffs conceded this fact. *Id*. at \*15, n. 8.

It is important to note that the Second Circuit never examined the validity of Greece's patrimony law or the merits of its application. Rather, the court determined the nature of the communication was sovereign

based on the mere existence of the law. In other words, the existence and application of the patrimony law, and any communication emanating from it, are sovereign: "[A]dopting its patrimony laws and insisting on compliance with those laws is enough to establish that its activity was sovereign rather than commercial." *Id.* at *15. In *Barnet*, the Plaintiffs' allegation that the patrimony laws were not applicable was irrelevant. Likewise, the application of Italy's patrimony laws is irrelevant here in determining jurisdiction under the FSIA, and it is beyond the scope of this Court's jurisdiction to examine their application. As explained by the Second Circuit, "litigation concerning the validity of a patrimony law requires the district court to evaluate the validity, scope, and application of patrimony laws—putting at issue precisely those sorts of sovereign acts for which sovereign nations enjoy immunity." *Id.* at *17.

The Second Circuit ruled that the district court did not have jurisdiction over Greece because doing so would "undermine the immunity Congress intended to confer on sovereigns under the FSIA." *Id.* (citing *Garb*, 440 F.3d at 589-90). In *Barnet*, the court found that Greece's communication with the auction house was connected to the sovereign activity of claiming ownership through nationalization of cultural heritage and enforcement of patrimony laws. The same is true here. Italy's communication with law enforcement in the U.S. was pursuant to the sovereign enforcement of its patrimony laws, and thus falls outside the scope of the commercial activity exception. The ruling in *Barnet* requires that this Court dismiss the instant case. Moreover, the facts here have an even weaker tie to commercial activity. Italy never communicated with Plaintiff or any other private party concerning the Head. Rather, Italy informed a law enforcement agency about the item. It is difficult to comprehend how Plaintiff could assert that communication with law enforcement about policing activity is commercial activity. Italy asserted its sovereign power vested by national ownership laws, and the channels used for its communication were regulatory and policing in nature.

### d. Italy holds cultural heritage in trust for its citizens and the world.

Italy conducted itself as a sovereign by representing the cultural interests of the nation and its citizens in reporting information about a missing artifact. The Museum's collection is held in trust by Italy; thus, its

13

interest in the Head is public and sovereign in nature, and it acted according to this function when contacting the Carabinieri. *Nelson,* 507 U.S. at 359-60.

Italy is obliged to protect heritage for its citizens under its Constitution. Article 9 of the Italian Constitution states that "[t]he Republic shall promote the development of culture and scientific and technical research. It shall safeguard natural landscape and the historical and artistic heritage of the Nation." Art. 9 Costituzione [Cost.] (It.). Protection of national heritage, including the enforcement of its patrimony laws, is not a commercial act, but rather dictated by sovereign responsibilities to protect property within its care. Thus, the Museum's custodianship of cultural heritage is an extension of Italy's sovereign duties to protect objects within its state-owned museum, a system that holds items in trust for the public and for future generations.[9]

This Court does not have jurisdiction over Italy because its tip to the DA was sovereign in nature, as it relates to the policing of nationalized property. Like Greece in *Barnet*, Italy seeks to enforce its patrimony laws to ensure its heritage is protected. That is sovereign activity. *See generally Barnet.* To hold otherwise "would allow the [commercial activity] exception to swallow the rule of presumptive sovereign immunity codified in the FSIA." *Barnet* at *16 (citing *Anglo-Iberia Underwriting Management v. P.T. Jamsostek*, 600 F.3d 171, 178 (2d Cir. 2010)). The precedent would interfere with international police power, whereby foreign nations would be stopped from communicating with U.S. law enforcement for fear that they might lose their immunity. The Second Circuit declined to read the exception so broadly; such an interpretation goes against congressional intent, as well as accepted international notions of grace and comity.

### e. Italy's tip to a law enforcement agency did not have a direct effect in the United States.

The commercial activity exception has often been treated as a long-arm statute, requiring minimum contacts (*i.e.*, nexus) in addition to a direct effect within the U.S. to establish jurisdiction over foreign nations. *Decor by Nikkei Int'l, Inc. v. Fed. Republic of Nigeria*, 497 F. Supp. 893, 903-904 (S.D.N.Y. 1980). This

---

[9] "When the government possesses cultural property, it acts as trustee on behalf of the relevant cultural group for protecting and utilizing the object for the benefit of the group." Patty Gerstenblith, Identity and Cultural Property: The Protection of Cultural Property in the United States, 75 B.U. L. REV. 559, 688 (1995).

ostensibly serves as a deterrent from subjecting foreign powers to vexatious litigation on U.S. soil and ensures that due process is respected.

The third prong of the commercial activity exception, covering direct effect, has three conjunctive requirements: "(1) that the operative act occur outside the United States, (2) that the act occur in connection with a commercial activity of the foreign state elsewhere, **and** (3) that the act cause a direct effect in the United States." *Chettri*, 834 F.3d at 57; §1605(a)(2) (emphasis added).

The first prong of the exception examines the act itself. The only act by Italy alleged by Plaintiff is the tip provided to law enforcement agents (Compl. at ¶5-6) which took place in the U.S. This is too tenuous a link to establish nexus. The second requirement is that the act was made in connection with commercial activity. Italy's act was policing, not commercial in nature. Thus, the second prong of the exception has not been fulfilled.

Finally, the third prong of the commercial activity exception requires that the relevant act actually produce a direct effect in the U.S. An effect is direct "if it follows as an **immediate** consequence of the defendant's activity," *Weltover*, 504 U.S. at 618 (emphasis added) and "has no intervening element, but, rather, flows in a straight line without deviation or interruption." *Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 74-75 (2d Cir. 2010) (quoting *Martin v. Republic of South Africa*, 836 F.2d 91, 95 (2d Cir. 1987)). The Second Circuit held that "the requisite immediacy is lacking where the alleged effect depends crucially on variables independent of the conduct of the foreign state." *Guirlando*, 602 F.3d at 75. The DA's seizure of the Head was not an immediate consequence of Italy's tip, but resulted from independent intervening acts. A foreign state's commercial activity eventually leading to a plaintiff's alleged injury is insufficient for purposes of finding a "direct effect." *See Nelson*, 507 U.S. at 358.

Here, there were multiple intervening events which arose after Italy's act, thus undercutting the application of direct effect: (1) the DA's evaluation of the Carabinieri's claim; (2) the DA's independent investigation of the Head; and (3) the DA's ultimate determination that there were grounds to seize an object

within its jurisdiction. Affirmation at ¶5. Those were not acts by Italy, but ones by an independent law enforcement agency that destroyed the immediacy required under *Guirlando*. The seizure was plainly not a "direct effect" within the meaning of the FSIA §1605(a)(2).

Italy did not avail itself of jurisdiction in a U.S. court. Italy's only activity was to inform the DA that a missing antiquity from a national collection was within the DA's jurisdiction. The Carabinieri does not have jurisdiction in N.Y., does not conduct investigations here, and merely provided the results of its investigation to the DA. As the DA is an independent law enforcement agency serving the People of N.Y. County, the seizure of the Head is a direct result of the DA's actions, not Defendant's. (As described in Section III below, the DA is the top-ranking law enforcement agency in N.Y. County. It is not, and has never been, an agent of Italy.) While it is true that Italy provided information to the DA, the latter does not follow directions or orders from a foreign government. Affirmation at ¶4. The DA has independent authority to make decisions regarding its investigations. *Id.*

The Second Circuit further implemented a "legally significant act test" as a requirement for establishing a "direct effect" under the FSIA. *See Weltover,* 504 U.S. at 607*; Antares Aircraft, LP v. Federal Republic of Nigeria*, 999 F.2d 33 (1993). This means that not every act taken by a foreign sovereign with a consequence in the U.S. will qualify as having a "direct effect." If the connection between the originating act and the consequence is too tenuous, as in this case, a court will not find that a direct effect took place. Italy's communication with the DA was an isolated incident that does not amount to legally significant conduct, as there was an intervening act which prevented the activity from having a direct effect. The seizure of the Head was not the immediate result of the Carabinieri's tip, but rather the result of the DA's own investigation after several steps took place.

It was a fortuitous circumstance that the Head ended up in the U.S., requiring Italy to contact U.S. law enforcement agents. Italy did nothing to create a connection to N.Y., and Italy had no choice but to contact U.S. authorities in furtherance of its own policing duty. Reading the direct effect requirement this expansively

is supported by neither law nor policy, as it would deter foreign states from exercising their sovereign functions with regard to missing property resurfacing in the U.S. It would turn the FSIA on its head to hold that a victim of a theft or lost property loses its sovereign immunity by communicating with policing agencies.

As a matter of law, Italy's communication corresponds to its sovereign policing authority. This act was carried out by the country's preeminent specialized police unit dedicated to the prevention of illegal trafficking of cultural property after a thorough criminal investigation; evidently, not something private parties can do. Moreover, there is no direct effect in the U.S. from Italy's tip due to intervening and independent circumstances.

### 2.   The Republic of Italy never waived its sovereign immunity.

Plaintiff makes a vague reference to a waiver but fails to explain how or why it applies here. Compl. at ¶44. For the sake of completion, we will explain why waiver within the context of FSIA is inapplicable.

Section 1605(a)(1) of the FSIA provides that a foreign state is not immune from jurisdiction if it "has waived its immunity either explicitly or by implication." 28 U.S.C. § 1605(a)(1). However, "it is well-settled that a waiver of sovereign immunity must be clear, complete, unambiguous, and unmistakable in order to be effective." *Aquinda v. Texaco, Inc.*, 175 F.R.D. 50, 52 (S.D.N.Y. 1997), *vacated*, 157 F.3d 153 (2d Cir. 1998) (vacated on other grounds). There must be "an intentional and knowing relinquishment of the legal right" in order for a waiver of immunity to be valid. *See Walker International Holdings Ltd. v. Republic of Congo*, 395 F.3d 229, 234 (5th Cir. 2004). A valid waiver of immunity must specifically be made by the foreign state and the relevant agency or instrumentality. *NML Capital, Ltd. v. Banco Central de la Republica Argentina*, 652 F.3d 172, 196 (2d Cir. 2011). Neither Italy, the Museum, or the Carabinieri waived their immunity in the present case.

Implicit waivers are generally disfavored and construed narrowly. *Drexel Burnham Lambert Grp. Inc. v. Comm. of Receivers for Galadari*, 12 F.3d 317, 325 (2d Cir. 1993). A broad interpretation of the FSIA waiver exception would lead to a "vast increase in the jurisdiction of the federal courts over matters involving

sensitive foreign relations." *See Cargill Int'l.*, 991 F.2d at 1017. It is important to note that an implicit waiver is found only when the waiver is clear and unmistakable, upholding the legislative history of the FSIA. *Id*.

Plaintiff failed to explain how Italy waived its presumed immunity. Here, there was no "intentional and knowing relinquishment of the legal right." *Walker, 395 F.3d at 234.* Italy has not taken any action that could be viewed as a clear, complete, unambiguous and unmistakable waiver of its immunity. Appearing in court to request a dismissal is not a waiver. In fact, courts rarely make such a finding except in the case of strong evidence. *Abelesz v. Magyar Nemzeti Bank,* 692 F.3d 661, 670 (7th Cir. 2012). In the absence of a responsive pleading without the defense of sovereign immunity, a contract between the parties, or an agreement to arbitrate or adjudicate a dispute in the U.S., there is no waiver, and Plaintiff's vague argument must fail. *See Barapind v. Government of Republic of India*, 844 F.3d 824 (9th Cir. 2016).

## II. Plaintiff named the wrong party in this suit; the acts alleged were not taken by a foreign nation, but by a U.S. law enforcement agency.

This civil case stems from Plaintiff's critical misunderstanding of the function of a prosecutor's office and its operation in preventing the commission of crimes within its jurisdiction. Throughout its Complaint, Plaintiff erroneously equates Italy with the DA, contending that the DA acted as Italy's agent by seizing and maintaining custody of the Head. Compl. at ¶¶55-58. Plaintiff reiterates this position in ¶60 and ¶63, relying upon the mistaken belief that Defendant's communication with the DA established an agency relationship. Compl. at ¶22. This fundamentally misconstrues the nature of Defendant's actions as well as the role and legal duties of the DA.

The DA's power was established *via* the N.Y. State Constitution in 1777 and confirmed by the N.Y. Consolidated Laws, County Law (Art. XXIII, N.Y. Const.: April 20, 1777; and CNT §927), with a core representative function for the People of N.Y. The DA has a legal and constitutional duty to investigate and prosecute crimes and offences in its jurisdiction. As a global financial capital, Manhattan is regularly exposed to criminal misconduct, including antiquities trafficking (which falls within the scope of the PL). In the instant

18

case, the DA seized the Head after conducting an independent investigation which suggested it is the same item missing from Italy, making Plaintiff a possessor of stolen property in violation of Art. 165 of the PL.

This is not the first case brought by the DA in the cultural heritage context. The Antiquities Trafficking Unit (the "Unit") was formed in 2017 as a response to the prevalence of illegal antiquities in N.Y. The Unit collects information (such as tips), investigates suspicious activity, and ultimately prosecutes relevant parties. Since its formation, the Unit has recovered thousands of antiquities collectively valued at over $150 million.[10] The DA may request information from foreign states after conducting independent investigations, and may prosecute parties in violation of N.Y. criminal laws.[11] A foreign nation may contact the DA if it suspects that stolen items have surfaced in N.Y. The DA then conducts an internal assessment and controls the investigation. Affirmation at ¶4. The foreign sovereign does not direct the investigation, does not determine which cases to prosecute under N.Y. law, and does not make determinations about N.Y. law enforcement procedures, such as seizures. *Id.* The DA's duty to act is not discretionary, but rather a legal requirement:

> "It shall be the duty of the district attorney...to prosecute all crimes and offenses cognizable by the courts of the county for which he shall have been elected or appointed....He shall perform the duties prescribed in section seven hundred of this chapter and such other duties as are prescribed by law." CNT §927.

The DA must act in the interest of the People of N.Y. when carrying out statutory functions, protecting them from falling victim to illegal activity. Although the DA may collaborate with local and international law enforcement agencies in its investigations, it does not serve as an agent of any foreign state. That would be incompatible with its obligations to the U.S. government and the People of N.Y. State.

An agency relationship exists between the DA and the People of N.Y., not between the DA and a foreign country. The DA is not subject to interference or instruction by foreign governments. Furthermore, the

---

10 *White Collar Crime*, MANHATTANDA, https://www.manhattanda.org/our-work/white-collar-crime/ (last visited Jun. 20, 2020).
11 *2016 Annual Report from the Office of New York County District Attorney Cyrus R. Vance, Jr.*, MANHATTANDA, https://www.manhattanda.org/wp-content/uploads/2018/02/2016-Annual-Report.pdf (last visited Jun. 20, 2020).

DA has never been added as a party in a lawsuit on behalf of a foreign state; as a criminal prosecutor, the DA acts as an arm of N.Y. state in a quasi-judicial capacity. *Baez v. Hennessy*, 853 F.2d 73, 77 (2d Cir. 1988). In addition, the DA is subject to immunity under the Eleventh Amendment when appropriate. *See Baez*, 853 F.2d at 77; *Crespo v. Rivera*, No. 16 CIV. 708 (PGG), 2018 WL 4500868.

Plaintiff's allegation that the DA operates not as an arm of N.Y. County, but as an instrumentality of a foreign state, is disconcerting. This is not only wrong, but also a fundamental misunderstanding of the DA's role as a government official. The DA seized the Head pursuant to its legal duty to protect N.Y. markets and consumers. (*Tr.* at 30:18-32:1). The acts Plaintiff identifies in the Complaint were carried out not at the behest of Italy, but in furtherance of the DA's statutory obligations. The DA's duty of care is to the People of N.Y. County, not the People of Italy. The DA cannot and does not act as an agent for a foreign sovereign.

For the sake of argument, supposing Plaintiff's allegations are true and the DA acted as Italy's agent, the alleged acts would still be insufficient to exert jurisdiction under the FSIA because they are regulatory and policing in nature. When a foreign government entity believes there is evidence of a crime and shares that suspicion with another government entity, it does not commit a commercial act within the meaning of FSIA. *See Chettri v. Nepal Rastra Bank*, 834 F.3d 50 (2d Cir. 2016) (finding that a national bank did not commit a commercial act when it alerted the relevant regulatory agency about a suspicious transaction).

III.     ***Upon dismissal from this Court, N.Y. Supreme Court is available to settle the controversy.***

Upon this Court's dismissal, the N.Y. Supreme Court, where this dispute is currently stayed, is an available and appropriate venue for adjudicating the controversy. As stated by Justice Farber during the November 13, 2019 hearing, the N.Y. Supreme Court has jurisdiction over this matter. *Tr.* at 28:23-24. In response to the Turnover Order, Plaintiff argued that N.Y. Supreme Court lacks jurisdiction and requested it to stay proceedings. *Tr.* at 40:10-41:14. Justice Farber declined to affirm Plaintiff's contention that N.Y. Supreme Court does not have jurisdiction because he "could do a civil proceeding, and [he] believes that [he

does] have the jurisdiction to hold a civil proceeding." *Tr.* at 50:25-51:4. He further notes that presiding over such a proceeding is "appropriate" in specific situations. *Tr.* at 51:13-14.

Nonetheless, Justice Farber ultimately stayed the case in N.Y. Supreme Court, not due to lack of jurisdiction, but in part because of his busy docket. He noted that his court is "hundreds of times busier – than Southern District of New York" *Tr.* at 50:23-25. However, Justice Farber's decision was conditional upon this Court finding jurisdiction. *Tr.* at 52:16-20. However busy the N.Y. Supreme Court may be, it does not serve the judicial economy to permit this Court to hear the same controversy as another competent court. Justice Farber has studied the evidence in this dispute and is familiar with both parties' arguments. The N.Y. Supreme Court presided over the matter for nearly two years prior to the court's order to stay.

As Justice Farber himself noted, there are instances in which the federal civil court might dismiss cases and return them to the N.Y. Supreme Court. That is the situation here, as this Court must dismiss the case due to lack of subject matter jurisdiction under the FSIA. Further still, the Assistant DA confirmed that his office will indeed pursue the matter in the N.Y. Supreme Court, if this Court dismisses the case. *Tr.* at 52:14-19. Plaintiff will be afforded the opportunity to be heard and comply with due process in such instance.

During the November 13, 2019 hearing, the ability of the N.Y. Supreme Court to conduct a plenary case was discussed. Justice Farber noted that he could "do a whole plenary hearing where [he] make[s] a determination as to ownership in a context that's going to have international implications." *Tr.* at 28:19-21. CPL §10.10[7] bestows both criminal and civil jurisdiction on the N.Y. Supreme Court:

"[A] court specified herein which possesses civil as well as criminal jurisdiction does not act as a criminal court when acting solely in the exercise of its civil jurisdiction, and an order or determination made by such a court in its civil capacity is not an order or determination of a criminal court even though it may terminate or otherwise control or affect a criminal action or proceeding."

The Court of Appeals in *People v. Museum of Modern Art (In re: Grand Jury Subpoena Duces Tecum)*, 93 NY2d 729, 740 (1999) ("*MoMA*") did exactly that, stating that "[PL] §450.10, which provides a mechanism for returning allegedly stolen property to an owner prior to, or during the pendency of, a criminal

proceeding, requires proof of title before property in the custody of the People or the court can be returned. Thus, a civil-like proceeding would have to be commenced in this case to return the paintings to the rightful owners under either CPL §610.25 (2) or PL §450.10—regardless of the outcome of the People's case." *MoMa* at 93 NY2d at 740. Justice Farber may continue with a civil-like proceeding. As this Court does not have jurisdiction under the FSIA, the federal civil case must be dismissed, and this matter should proceed in the N.Y. Supreme Court, allowing Plaintiff to defend itself in the related controversy's initial venue.

IV.    **It is against public policy to require foreign nations to defend themselves in U.S. courts for providing information to law enforcement agencies.**

### A. It is essential for foreign nations to communicate with law enforcement agencies.

The legislative and judicial history of the FSIA notes that sovereign immunity is essential for international relations. *See Republic of Aus. v. Altmann*, 541 U.S. 677, 688 (2004). There must be a sufficient nexus and level of activity within the U.S. to require foreign sovereigns to defend themselves; this is precisely why the FSIA was enacted. For the sake of maintaining political relationships, the U.S. respects foreign sovereigns' powers as long as they do not engage in commercial activity, since then they act as private parties within the market.

However, private parties do not, and cannot, police a nation's heritage, but it is essential that nations are able to do so. Without the ability to protect heritage under their custodial care, foreign nations will suffer tremendous losses. The instant case has broader implications than for the citizens of Italy—it is important for citizens of the world. As guardian of its heritage, Italy has a constitutional duty to protect it from illegal activities. Art. 117 (s) Costituzione [Cost.] (It.). For centuries, Italy[12] has suffered the widespread loss and destruction of its cultural heritage, which unfortunately continues today.[13] Like many nations, including the

---

[12] With one of the highest densities of historic remains in the world, Italy is home to a rich legacy of history and culture, boasting 55 UNESCO World Heritage Sites, the highest number of any country. *Italy, Properties inscribed on the World Heritage List (55)*, UNESCO, https://whc.unesco.org/en/statesparties/it (last visited Jun. 20, 2020).
[13] Frank Viviano, Italy's Artifacts Police Wage Global War, Recover 137,000 Objects, NATIONAL GEOGRAPHIC (Jun. 19, 2015), https://www.nationalgeographic.com/news/2015/06/150618-carabinieri-morgantina-italy-art-theft-antiquities-trafficking/.

U.S.,[14] preventing looting is an overwhelming task for Italy. Often, stolen and missing cultural items resurface in N.Y. because it is an international hub for art transactions. See *People of the State of New York v. Weiner*, SCI-05191-2016 (Sup. Ct. Dec. 21, 2016) (a prominent dealer was arrested on charges of possessing and conspiring to buy and sell looted antiquities transported into N.Y.); *United States v. An Antique Platter of Gold*, 991 F. Supp. 222 (S.D.N.Y. 1997) *aff'd*, 184 F.3d 131 (2d Cir. 1999) (federal authorities seized a valuable antiquity illicitly removed from Italy and purchased by a well-known N.Y. collector); *United States v. Schultz*, 333 F.3d 393 (2d Cir. 2003), cert. denied, 540 U.S. 1106 (2004) (a N.Y. antiquities dealer was charged with conspiracy to receive stolen antiquities in violation of the National Stolen Property Act).

Furthermore, it is important that sovereigns communicate with law enforcement to prevent heritage items from disappearing on the black market. Restricting communication in this context would muzzle a foreign sovereign's policing abilities and have serious repercussions for U.S. relations abroad, as they depend on comity and voluntary cooperation. Even more, the precedential effect of this case would prevent crime victims from pursuing justice for fear that a tip would require them to defend themselves in U.S. court. This costly punitive measure targets national agencies, who often operate with limited financial and human resources. As noted during the hearing in support of the DA's Turnover Application, "Countries do not have the resources" to enact many claims. *Tr.* at 30:6. What options are available to sovereigns should they be prevented from communicating with law enforcement authorities in the limited cases they are able to pursue?

### B. Silencing sovereigns will ultimately harm the art market and the People of N.Y.

---

[14] The U.S. government struggles to protect Native American remains from looters and unscrupulous collectors, even in light of Native American Graves Protection and Repatriation Act, Pub. L. 101-601, 25 U.S.C. 3001 et seq., 104 Stat. 3048, due to high demand for them. Becky Little, Why Graverobbers Won't Leave Native American Burial Sites Alone, HISTORY (Mar. 4, 2019), https://www.history.com/news/native-american-burial-site-theft.

The negative effects on private art buyers must not be ignored, as they will also be affected if foreign agencies are unable to contact policing agencies. In fact, the U.S. Department of State and Italy entered into a mutual legal assistance treaty in 1982 with the express intention to "allow generally for the exchange of evidence and information in criminal and related matters."[15] The spirit of this agreement reflects the importance of cooperation between law enforcement agencies to "encourage foreign governments to cooperate in joint investigations." *Id.*

Discouraging sovereigns from providing tips about missing or stolen items would wreak havoc on the art market. Silencing victims or anyone with essential information about suspect goods would allow N.Y. to become a haven for stolen goods; hence, it has a vested interest in a legal and transparent antiquities trade, and it is essential that the state not become a marketplace for looted goods. Courts have long recognized that N.Y. "enjoys a worldwide reputation as a preeminent cultural center" that should not be a haven for stolen or missing property. *See Guggenheim v. Lubell*, 77 N.Y.2d 311, 320 (1991). "The manner in which the New York rule is applied reflects an overarching concern that N.Y. not become a marketplace for stolen goods and, in particular, for stolen artwork." *Bakalar v. Vavra*, 619 F. 3d 136, 140 (2d Cir. 2010). To protect consumers, N.Y. courts adapted rules particular to stolen art and artifacts. N.Y. policy aims to preserve the integrity of transactions and prevent the state from becoming a market for stolen goods. *Angiolillo v. Christie's, Inc.*, 64 Misc. 3d 500, 519–20, 103 N.Y.S.3d 244, 260 (N.Y. Sup. Ct. 2019), *citing Kunstsammlungen zu Weimar v. Elicofon*, 536 F. Supp. 829, 846 (E.D. N.Y. 1981).

With the shadow of Nazi looted art making its way across the market, this Court and the Second Circuit have chosen to protect consumers from purchasing illicit goods. For example, N.Y. crafted the Demand and Refusal Rule to toll the statute of limitations to protect victims, even in cases in which decades have passed since an item went missing. *See Republic of Turkey v. Metropolitan Museum of Art*, 762 F.

---

[15] *Treaties and Agreements*, U.S. DEPT. OF STATE (Mar. 7, 2012), https://2009-2017.state.gov/j/inl/rls/nrcrpt/2012/vol2/184110.htm.

Supp. 44 (S.D.N.Y. 1990) (decades after a hoard of antiquities went missing from Turkey and was acquired by the Metropolitan Museum of Art, the museum returned it after this Court rejected the museum's assertion that the statute of limitations had expired because Turkey did not diligently locate the property); *Kunstsammlungen zu Weimar v. Elicofon*, 678 F.2d 1150 (2d Cir. 1982) (tolling the statute of limitations in a dispute involving property that went missing during World War II and resurfaced decades later in N.Y.).

Both individuals and agencies, domestic as well as foreign, should be encouraged to supply information about looted or stolen items, and not desist out of fear of retaliatory or costly litigation. Without the ability to address these matters with proper policing authorities (here, the DA), there will be an increase of illicit goods on the market with far-reaching consequences. The DA must be able to effectively protect the People of N.Y. Without the valuable information provided by foreign law agencies, the sale of stolen goods will go unchecked, N.Y. consumers will be subjected to unknowingly purchasing stolen property, and foreign nations will have no channel to exercise their sovereign regulatory or policing powers.

## CONCLUSION

This Court does not have jurisdiction over Italy under the FSIA because none of the enumerated exceptions that would deny the sovereign of its presumed immunity apply. In light of the Second Circuit's recent unanimous opinion in *Barnet* respecting the sovereign nature of nations' regulating of property in accordance with sovereign patrimony laws, this case must be dismissed. Further, the channels used to enforce this sovereign law were regulatory and policing in nature. For both these reasons, Italy never sacrificed its immunity before U.S. courts. Allowing Plaintiff to haul Italy into court would effectively punish nations from engaging in valid law enforcement duties and communicating with competent agencies in the U.S. Finding jurisdiction over Italy would contradict long-standing U.S. policy respecting international grace and comity. We respectfully pray for dismissal of the instant case. The interests of the People of N.Y., federally-established notions of grace and comity, and the concept of fairness require no less.

New York, New York Dated: June 22, 2020

**Amineddoleh & Associates LLC**
By: *s/ Leila A. Amineddoleh* Bar Number 1211
Leila A. Amineddoleh
Polina Ivko

43 West 43 Street, Suite 171
New York, NY 10036
Telephone: 212 709-8149
Leila@artandiplawfirm.com

*Attorneys for Defendant, La Repubblica Italiana*