**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

– – – – – – – – – – – – – – – – – – – – – – – – – – X

Safani Gallery, Inc.,                                           :

                  Plaintiff,                   :          Case No. 19-cv-10507

        -against-                        :

The Italian Republic,                                      :

              Defendant.                 :

                                :

                                :

– – – – – – – – – – – – – – – – – – – – – – – – – – X

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**
**PLAINTIFF'S AMENDED COMPLAINT**

Leila A. Amineddoleh
Polina Ivko
Amineddoleh & Associates LLC
43 West 43rd Street, Suite 171
New York, NY 10036
Attorneys for Defendant,
The Italian Republic

## Table of Contents

Preliminary Statement...........................................................................................................1

Procedural History ...............................................................................................................1

Facts ....................................................................................................................................2

Argument ............................................................................................................................4

I.      THE COMPLAINT MUST BE DISMISSED UNDER THE FSIA...............................4

        A.      The FSIA is the sole basis for jurisdiction over a foreign sovereign...............................4

        B.      Jurisdiction is a threshold question...........................................................................4

        C.      None of the FSIA's exceptions apply here .................................................................5

                1.      There was no property taken in violation of international law............................5

                        a.      Four-pronged approach ........................................................................6

                                i.      This case involves a property dispute .........................................6

                                ii.     A "taking" was never committed because Italy never took
                                        possession of the Head.................................................................6

                                iii.    There was no violation of international law...............................9

                                        A.      Italy meets its obligations under the 1970 UNESCO
                                                Convention .................................................................9

                                        B.      Communicating with the DA is not a violation of the
                                                Memorandum of Understanding ("MOU") between Italy
                                                and the U.S. ...............................................................12

                                        C.      A phone call between law enforcement agencies is not a
                                                violation of human rights ............................................13

                                        D.      Customary international law was not violated .............13

                                        E.      Plaintiff was afforded due process...............................14

                                iv.     There was no commercial activity as required under 1605(a)(3)
                                        ............................................................................................16

                                        A.      Plaintiff cannot meet the commercial activity requirement
                                                articulated in 4(a) because the Head is not present in the
                                                U.S. in connection with commercial activity by Italy ...16

B.       Although inapplicable here, Plaintiff would also be
unable to meet the less stringent requirement of 4(b)
because the Ministry did not operate the Head ............17

2.       Italy's phone call to the DA was not tortious.....................................................18

a.       Italy's Conduct Does Not Fall Within the Spirit of §1605(a)(5)............18

b.       Plaintiff Has Not Alleged a Tort Under §1605(a)(5)............................18

c.       Italy's Action Falls Within the Discretionary Exception under
§1605(a)(5)(A) ....................................................................................19

3.       The Republic of Italy never waived its sovereign immunity .............................20

4.       Even if one of the FSIA exceptions applied, this matter is non-justiciable ........20

II.       PLAINTIFF NAMED THE WRONG PARTY; THE ACTS ALLEGED WERE NOT TAKEN
BY ITALY, BUT BY THE DA ...........................................................................................21

III.      UPON DISMISSAL FROM THIS COURT, N.Y. SUP. CT. IS AVAILABLE TO SETTLE THE
CONTROVERSY....................................................................................................................23

IV.       IT IS AGAINST PUBLIC POLICY TO REQUIRE FOREIGN NATIONS TO DEFEND
THEMSELVES IN U.S. COURTS FOR PROVIDING INFORMATION TO LAW
ENFORCEMENT AGENCIES ..............................................................................................24

Conclusion .......................................................................................................................................26

**Table of Authorities**

**CASES:**

*Abelesz v. Magyar Nemzeti Bank,* 692 F.3d 661 (7th Cir. 2012) ................................................5, 20

*Aboutaam v. L'Office Federale de la Culture de la Confederation Suisse,* No. 1:18-cv-08248 (RA), 2019 WL 4640083 (S.D.N.Y.  2019).................................................................................. 6, 7, 8, 9

*Acadia Tech., Inc. v. United States*, 458 F.3d 1327 (Fed. Cir. 2006) .................................................8

*Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003) .........................................................................21

*AmeriSource Corp. v. United States,* 525 F.3d 1149 (Fed. Cir. 2008) ...............................................8

*Aquinda v. Texaco, Inc.*, 175 F.R.D. 50 (S.D.N.Y. 1997) .............................................................20

*Argentine Rep. v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989) .....................................4, 18

*Arteaga-Ruiz v. United States*, 164 F. Supp. 3d 1198 (D. Idaho 2016)...........................................19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................................9

*Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517 (D.C. Cir. 1984) .................18

*Baez v. Hennessy*, 853 F.2d 73 (2d Cir. 1988) ...............................................................................22

*Bakalar v. Vavra*, 619 F.3d 136 (2d Cir. 2010)...........................................................................9, 25

*Baker v. Carr*, 369 U.S. 186 (1962) ..........................................................................................20, 21

*Barnet v. Min. of Culture & Sports of the Hellenic Rep.*, 961 F.3d 193 (2d Cir. 2020)...13, 14, 16, 17

*Bolivarian Rep. of Venez. v. Helmerich & Payne Int'l Drilling Co.*, 137 U.S. 1312 (2017) ..... 5, 9, 14

*Cargill Int'l. S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012 (2d Cir. 1993)...........................................5

*Chettri v. Nepal Rastra Bank,* 834 F.3d 50 (2d Cir. 2016) .....................................................7, 8, 14

*Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S. 532 (1985)...........................................................15

*Crespo v. Rivera*, No. 16 CIV. 708 (PGG), 2018 WL 4500868 (S.D.N.Y. 2018)...........................22

*de Csepel v. Rep. of Hung.*, 859 F.3d 1094 (DC Cir. 2017).........................................................5, 6

*Doe v. Fed. Democratic Rep. of Ethiopia*, 851 F.3d 7 (D.C. Cir. 2017) .........................................18

*Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410 (S.D.N.Y. 2019) ........................18

*Drexel Burnham Lambert Grp. Inc. v. Comm. of Receivers for Galadari*, 12 F.3d 317 (2d Cir. 1993) ......................................................................................................................................20

*Foremost-McKesson, Inc. v. Islamic Rep. of Iran*, 905 F.2d 438 (D.C. Cir. 1990)............................4

*Freund v. Rep. of France*, 592 F. Supp. 2d 540 (S.D.N.Y. 2008)........................................ 16, 17, 21

*Garb v. Rep. of Poland*, 440 F.3d 579 (2d Cir. 2006) ......................................................... 7, 16, 17

*Greenpeace, Inc. v. State of France*, 946 F. Supp. 773 (C.D. Cal. 1996)..........................................9

*Guevara v. Rep. of Peru*, 608 F.3d 1297 (11th Cir. 2010) ................................................................7

*Guggenheim v. Lubell*, 77 N.Y.2d 311 (1991) ...............................................................................25

*Hilsenrath v. Swiss Confed.*, 2007 WL 3119833 (N.D. Cal. 2007)...............................................8, 19

*Jacubovich v. Israel*, No. 19-2970-CV, 2020 WL 2769094 (2d Cir. 2020) ......................................5

*Jerez v. Republic of Cuba*, 775 F.3d 419 (D.C. Cir. 2014) .............................................................18

*Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995) .............................................................................21

*Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111 (2d Cir. 2010)................................................13

*Kunstsammlungen zu Weimar v. Elicofon*, 678 F.2d 1150 (2d Cir. 1982)........................................25

*Matthews v. Eldridge*, 424 US 319 (1976)....................................................................................15

*McKesson Corp. v. Islamic Rep. of Iran*, 672 F.3d 1066 (D.C. Cir. 2012)........................................5

*Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306 (1950) ....................................................15

*NML Capital, Ltd. v. Banco Central de la Republica Argentina*, 652 F.3d 172 (2d Cir. 2011) ........20

*Petersen Energía Inversora S.A.U. v. Argentine Rep.*, 895 F.3d 194 (2d Cir. 2018)........................16

*People of the State of New York v. Weiner*, SCI-05191-2016 (Sup. Ct. 2016) .................................24

*Phoenix Consulting, Inc. v. Rep. of Angola*, 216 F.3d 36 (D.C. Cir. 2000)........................................5

*Rep. of Austria v. Altmann*, 541 U.S. 688 (2004) ....................................................................21, 24

*Rep. of Turkey v. Metropolitan Museum of Art*, 762 F. Supp. 44 (S.D.N.Y. 1990) .........................25

*Robinson v. Gov't of Malay.*, 269 F.3d 133 (2d Cir. 2001) ............................................................18

*Sabow v. United States*, 93 F.3d 1445 (9th Cir. 1996)...................................................................19

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993) ........................................................ 4, 16, 17

*Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, (1812) .................................. 4

*Schubarth v. Fed. Rep. of Germany*, 891 F.3d 392 (DC Cir. 2018 .................................... 5

*Simon v. Rep. of Hung.*, 421 U.S. App. D.C. 67 (2016) ................................................ 5

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) ........................................................ 13

*Smith Rocke Ltd. v. Republica Bolivariana de Venezuela*, 12- CV-7316 (LGS), 2014 WL 288705 (S.D.N.Y. 2014) ................................................................................................ 7

*Swarna v. Al-Awadi*, 622 F.3d 123 (2d Cir. 2010) ................................................ 18, 19

*United Euram Corp. v. Union of Soviet Socialist Republics*, 461 F. Supp. 609 (S.D.N.Y. 1978) ..... 18

*United States v. An Antique Platter of Gold*, 991 F. Supp. 222 (S.D.N.Y. 1997) *aff'd*, 184 F.3d 131 (2d Cir. 1999) ...................................................................................... 2, 14, 24

*United States v. McClain*, 545 F.2d 988 (5th Cir. 1977) ............................................ 14

*United States v. Schultz*, 333 F.3d 393 (2d Cir. 2003) .............................................. 24

*Verlinden B.V. v. Cent. Bank of Nig.*, 461 U.S. 480 (1983) ........................................... 4

*Walker Int'l Holdings Ltd. v. Rep. of Congo*, 395 F.3d 229 (5th Cir. 2004) ......................... 20

*Whiteman v. Dorotheum GmbH & Co.*, 431 F.3d 57 (2d Cir. 2003) ...................................... 21

*Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247 (2d Cir. 2000) .............. 5, 6, 7

## STATUTES & REGULATIONS:

19 U.S.C. §2604, 2606(a), 2607, 2609 ................................................................ 11

28 U.S.C. §§1330(a) ................................................................................... 5

28 U.S.C. §1604 .................................................................................... 4, 5

28 U.S.C. §1605(a)(1), (3), (5) ................................................................. 6, 19, 20

Art. XXIII, N.Y. Const.: April 20, 1777 ............................................................. 22

Import Restrictions Imposed on Archaeological Material Originating in Italy and Representing the Pre-Classical, Classical, and Imperial Roman Periods, 66 Fed. Reg. 7399 (Jan. 23, 2001) ............. 12

N.Y. County Law § 927 (McKinney) .................................................................... 22

**OTHER AUTHORITIES:**

*2016 Annual Report from the Office of New York County District Attorney Cyrus R. Vance, Jr.*, MANHATTANDA, https://www.manhattanda.org/wp-content/uploads/2018/02/2016-Annual-Report.pdf (last visited Jun. 20, 2020) ...........................................................................................22

Art. 9 Costituzione [Cost.] (It.) (official English translation can be found at https://www.senato.it/documenti/repository/istituzione/costituzione_inglese.pdf) ............................3

Art. 101 Costituzione [Const.] (It.) ...................................................................................................3

Becky Little, *Why Graverobbers Won't Leave Native American Burial Sites Alone*, HISTORY (Mar. 4, 2019), https://www.history.com/news/native-american-burial-site-theft .....................................24

Blythe A. Bowman, *Transnational Crimes Against Culture: Looting at Archaeological Sites and the 'Grey' Market in Antiquities by Bowman*, 24 J. Contemp. Crim. Just. 225 (2008) ...........................10

*Brief for the U.S. as Amicus Curiae* at 20-21, *Helmerich*, 137 S.Ct. 1312 (2017) (No. 15-423), 2016 WL 4524346 at *21-22 ...........................................................................................................14

The Carabinieri TPC, MINISTERO DELLA DIFESA, http://www.carabinieri.it/multilingua/en/the-carabinieri-tpc (last visited Jun. 20, 2020) ...........................................................................................3

Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property 1970, Nov. 14, 1970, 823 U.N.T.S 231 .........................................10

C.p.p., art. 55 (1989) .......................................................................................................................3

C.p.p., art. 57 (1989) .......................................................................................................................3

Dave Schechter, *Jeffrey Epstein Consulted Atlanta Attorney Days Before Death*, ATLANTA JEWISH TIMES (Dec. 23, 2019), https://atlantajewishtimes.timesofisrael.com/yir-jeffrey-epstein-consulted-atlanta-attorney-days-before-death/ ...........................................................................................................23

Duncan Chappell & Saskia Hufnagel, *Palgrave Handbook on Art Crime*, 13 (2019) ........................3

Eileen Kinsella, *The Art Loss Register is Entangled in Three Major International Art Disputes*, ARTNET (Jun. 5, 2016), https://news.artnet.com/art-world/art-loss-register-embroiled-least-three-international-art-disputes-305134 .......................................................................................................3

Frank Viviano, *Italy's Artifacts Police Wage Global War, Recover 137,000 Objects*, National Geographic (Jun. 19, 2015), https://www.nationalgeographic.com/news/2015/06/150618-carabinieri-morgantina-italy-art-theft-antiquities-trafficking/ ...................................................12, 24

Hearing on H.R. 3493 Before the Subcomm. on Claims & Gov't Relations of the H. Comm. on the Judiciary, 93d Cong., at 21 (1973) ...............................................................................................18

H.R.Rep. No. 19-1487, at 19-20 (1976) .....................................................................................7, 16

*Italy, Properties inscribed on the World Heritage List (55)*, UNESCO, https://whc.unesco.org/en/statesparties/it (last visited Jun. 20, 2020)..............................................24

Laurie Rush & Luisa Benedettini Millington, *The Carabinieri Command for the Protection of Cultural Property* (2015) ................................................................................................................3

Patty Gerstenblith, *Identity and Cultural Property: The Protection of Cultural Property in the United States*, 75 B.U. L. Rev. 559, 688 (1995)..............................................................................13

Patty Gerstenblith, *The Public Interest in the Restitution of Cultural Objects*, 16 Conn. J. Int'l L. 197, 239 (2001) ........................................................................................................................14

*Signatories to the Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property. Paris, 14 November 1970*, UNESCO, https://pax.unesco.org/la/convention.asp?KO=13039&language=E#1 (last visited Aug. 18, 2020).10

Terms and Conditions of Search, Art Loss Register, http://www.artloss.com/content/terms-and-conditions-of-search (last visited Jun. 4, 2020)...............................................................................3

*Treaties and Agreements*, U.S. Dept. of State (Mar. 7, 2012), https://2009-2017.state.gov/j/inl/rls/nrcrpt/2012/vol2/184110.htm ...................................................................24

Universal Declaration of Human Rights at art. 10, G. A. Res. 217A (III), U. N. Doc. A/810 (1948)13

Defendant La Repubblica Italiana ("Italy") respectfully submits this memorandum of law in support of its motion to dismiss the Amended Complaint filed by Safani Gallery, Inc. ("Plaintiff").

## PRELIMINARY STATEMENT

This case stems from a tip sent to the Manhattan District Attorney's Office (the "DA") by the Arma dei Carabinieri (the "Carabinieri"), Italy's judicial police force, concerning an object from Italy. Plaintiff's claim rests on its misunderstanding of the DA's law enforcement functions in New York County ("N.Y."), revealing that its allegations against Defendant were not acts conducted by Italy, but by U.S. law enforcement. Italy is immune from the jurisdiction of this Court under the Foreign Sovereign Immunity Act ("FSIA"), and thus this case must be dismissed.

## PROCEDURAL HISTORY

The Head of Alexander ("the Head") was seized by the DA on February 22, 2018, pursuant to a warrant issued by the Supreme Court of the State of N.Y., County of N.Y. ("N.Y. Sup. Ct."). On February 27, 2018, the DA informed Plaintiff of evidence indicating the Head was stolen. The DA investigated these claims over the following months. In July 2018, the DA concluded its investigation and determined that the Head constituted stolen property under N.Y. Penal Code ("PL"). This is explained in the DA's July 2018 Turnover Application and its Reply to Application for Turnover Order, *In the Matter of the Safani Gallery Inc. Search Warrant*, No. GJF2017-11212F (Sup. Ct. Nov. 13, 2019) ("Applic.") (Ex. A). On December 2, 2018, Plaintiff opposed the DA's application *via* a motion alleging violations of due process and lack of jurisdiction. The DA replied on January 3, 2019, stating that all evidence was made available to Plaintiff and the warrant-issuing court could resolve the matter. Ten months later, Plaintiff filed its Complaint before this Court and requested N.Y. Sup. Ct. to stay proceedings, which was granted contingent upon this Court finding jurisdiction. Tr. of Oral Argument at 51:10-52:5, *In the Matter of the Safani Gallery Inc. Search Warrant*, No. GJF2017-11212F (Sup. Ct. Nov. 13, 2019) ("*Tr.*") (Ex. B). In

response to Plaintiff's Complaint asserting jurisdiction under the commercial activity exception,[1] Italy moved to dismiss on June 22, 2020. On July 20, Plaintiff submitted an Amended Complaint ("Am. Compl."). Italy now moves to dismiss based on Plaintiff's citations to new jurisdictional grounds. Plaintiff is forum-shopping for a more favorable outcome despite parallel state court litigation. However, this Court does not have jurisdiction over Italy under the FSIA.

## FACTS

The Head,[2] a marble antiquity, was discovered during a state-sponsored excavation in Italy at the Roman Forum, one of the most significant archaeological sites in the world. It was transferred to Antiquarium Forense (the "Museum"), a museum established by Italy. The Head was listed as "perdute" ("missing") during an inventory conducted in November 1960. The Museum never sold, deaccessioned, or relinquished ownership of the antiquity. Rather, the Museum maintained records of the Head, including identifying photographs. Italy has a robust system of legal protection for this type of material, including sovereign patrimony laws. *United States v. An Antique Platter of Gold*, 991 F. Supp. 222, 227, n. 25 (S.D.N.Y. 1997) *aff'd*, 184 F.3d 131 (2d Cir. 1999).

The Head reemerged in a private collection and was sold by Sotheby's in N.Y. in 1974. This was prior to the internet and wide availability of auction catalogs, making it nearly impossible for the Museum to discover the sale. There was no provenance (ownership history) provided, and thus Italy was not listed as the origin source. Moreover, it was mislabeled as a "[m]arble head fragment of Apollo." Applic. at ¶26. Tellingly, the Head was consigned to Sotheby's along with another piece identified as missing during the same Museum inventory. Applic. at ¶26.

The Head resurfaced at Sotheby's in 2011. Once more, it was nearly impossible for Italy to discover it due to its unlisted origin and identification as "Alexander." According to Plaintiff, it purchased

---

1 Although not named as the basis for jurisdiction, Plaintiff's Complaint used the entirety of the language from the commercial activity exception as grounds for jurisdiction.  Compl. ¶6

2 The Plaintiff refers to the bust as "Alexander the Great," but that is a misnomer because it most likely depicts a Parthian Barbarian. For consistency of language, we use "the Head" in this filing.

the Head from Classical Galleries LTD, which received it from a "Foundation." Am. Compl. ¶9. Plaintiff purportedly purchased the Head in the United Kingdom and hired an unnamed expert to inquire into its provenance. Am. Compl.  ¶10-11. Plaintiff also relies on a letter by Art Loss Register ("ALR"), a private company that checks its limited database of stolen art when a buyer inquires about a sale. However, ALR acknowledges that its searches merely reduce the chance of acquiring looted items, and its results are not always accurate.[3] It has been noted that some collectors misuse the ALR to falsely assert good faith.[4]

In 2018, a Museum employee recognized the Head from an advertisement and contacted the Carabinieri.[5] Its responsibilities are established by Art. 9 Costituzione [Cost.] (It.) and the Italian Code of Criminal Procedure. C.p.p., art. 57 (1989). The Carabinieri are required to record crimes, mitigate their consequences, search for perpetrators, and collect evidence. *Id.* at art. 55. There is a specialized unit of the Carabinieri, *Tutela Patrimonio Culturale* ("TPC") tasked with protecting heritage;[6] it has gained widespread recognition for its work.[7]

The TPC investigated the Head and informed the DA of its history, Italy's ownership *via* patrimony laws, and its location in N.Y. The DA investigated the claims, conducting a thorough and well-documented investigation. Assistant DA Matthew Bogdanos' Affirm. ("Affirm.") (Ex. C) at ¶6. Italy had no authority over the DA's actions. In fact, "to avoid jeopardizing the integrity of any investigation, [the DA] directs representatives of foreign governments not to interfere in the investigation or to communicate

---

3 Terms and Conditions of Search, ART LOSS REGISTER, http://www.artloss.com/content/terms-and-conditions-of-search (last visited Jun. 4, 2020).

4 A leading publication reported that ALR is not "reliable," noting instances of misuse of information. Eileen Kinsella, *The Art Loss Register is Entangled in Three Major International Art Disputes*, ARTNET (Jun. 5, 2016), https://news.artnet.com/art-world/art-loss-register-embroiled-least-three-international-art-disputes-305134; "ALR has been criticised in the past for issuing certificates that an object was not registered on its database without querying the provenance…" DUNCAN CHAPPELL & SASKIA HUFNAGEL, PALGRAVE HANDBOOK ON ART CRIME, 13 (2019).

5 In Italy, the judicial branch is autonomous; justice is administered in the name of the people and judges are subject only to the law. Art. 101 Costituzione [Const.] (It.) (official English translation can be found at https://www.senato.it/documenti/repository/istituzione/costituzione_inglese.pdf).

6 The Carabinieri TPC, MINISTERO DELLA DIFESA, http://www.carabinieri.it/multilingua/en/the-carabinieri-tpc (last visited Jun. 20, 2020).

7 *See, e.g.*, Laurie Rush & Luisa Benedettini Millington, *The Carabinieri Command for the Protection of Cultural Property* (2015).

with any of the parties." Affirm. at ¶5. The only communication with the DA in this matter was the TPC's initial phone call.

Pursuant to its duties to protect N.Y. consumers from purchasing stolen property,[8] the DA seized the Head in February 2018. Plaintiff filed this lawsuit in November 2019, after requesting a stay in N.Y. Sup. Ct. Jurisdiction over Italy can only be established through the FSIA, whose statutory exceptions are limited. None apply here; thus, dismissal must be granted.

<b><u>ARGUMENT</u></b>

**I.  THE COMPLAINT MUST BE DISMISSED UNDER THE FSIA**

<b>A. <i>The FSIA is the sole basis for jurisdiction over a foreign sovereign</i></b>

This Court lacks subject matter jurisdiction under 28 U.S.C. § 1330 because the FSIA is "the sole basis for obtaining jurisdiction over a foreign state in [U.S.] courts." *Argentine Rep. v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). For over two centuries, U.S. courts have upheld sovereign immunity as a matter of comity and international relations. *See Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, (1812). Under the FSIA, a foreign state is presumptively immune from the jurisdiction of a U.S. court. 28 U.S.C. §1604; *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993). The Supreme Court has consistently held that the structure and text of the FSIA indicate Congress' intention for this statute to be the only means of obtaining jurisdiction over a foreign sovereign. *See Amerada Hess*, 488 U.S. at 439-40.

<b>B. <i>Jurisdiction is a threshold question</i></b>

To preserve sovereign immunity under the FSIA, this Court must make the critical determination of jurisdiction as early as possible. *Foremost-McKesson, Inc. v. Islamic Rep. of Iran*, 905 F.2d 438, 449 (D.C. Cir. 1990).  A court must satisfy itself that one of the exceptions applies as a threshold matter because subject matter jurisdiction will depend upon this finding. *Verlinden B.V. v. Cent. Bank of Nig.*, 461 U.S. 480, 493-94 (1983). To do otherwise would frustrate the significance and benefit of a sovereign's

---

[8]See discussion in Section III.

entitlement to immunity. 28 U.S.C. §§1330(a), 1604; *Phoenix Consulting, Inc. v. Rep. of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000).

## C. *None of the FSIA's exceptions apply here*

A plaintiff bears the burden of establishing that one of the enumerated exceptions to the FSIA applies. *Cargill Int'l. S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993)). Here, Plaintiff alleges that 28 U.S.C. §§ 1605(a)(3) and 1605(a)(5) apply. Neither of them do. These exceptions, like all the FSIA exceptions, must be narrowly construed. *Jacubovich v. Israel*, No. 19-2970-CV, 2020 WL 2769094, at *1 (2d Cir. 2020). Italy's only act was a communication informing law enforcement about the missing Head's whereabouts in N.Y. Am. Compl. ¶23. This does not trigger an exception.

### 1.    There was no property taken in violation of international law

The expropriation exception was enacted to protect U.S. interests from takings by foreign governments where local remedies were inadequate. *Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 251 (2d Cir. 2000). Following U.S. State Department policy, the FSIA's drafters limited it to situations when a taking in violation of international law is accompanied by commercial activity. *See Bolivarian Rep. of Venez. v. Helmerich & Payne Int'l Drilling Co.*, 137 U.S. 1312, 1320 (2017). Courts consistently construe this exception very narrowly. *See, e.g., Schubarth v. Fed. Rep. of Germany*, 891 F.3d 392 (DC Cir. 2018); *de Csepel v. Rep. of Hung.*, 859 F.3d 1094 (DC Cir. 2017). An expansive reading would lead to retaliatory treatment in foreign courts, which sovereign immunity is meant to prevent. *See McKesson Corp. v. Islamic Rep. of Iran*, 672 F.3d 1066, 1075 (D.C. Cir. 2012).

Expropriation in the context of art has been found in cases involving takings by the Nazis or sovereign collaborators. *Simon v. Rep. of Hung.*, 421 U.S. App. D.C. 67, 72 (2016) (noting that the "case arises out of one of humanity's darkest hours."); *Abelesz v. Magyar Nemzeti Bank,* 692 F.3d 661, 675 (7th Cir. 2012). These involve campaigns of discrimination, looting, and genocide where millions of people were murdered and dispossessed of property. Because genocide is recognized as a violation of international law, property seizures resulting from the Holocaust are takings exempt from immunity. *de*

*Csepel*, 859 F.3d at 164. Takings during the commission of genocide are starkly different from the instant case.

### a.    Four-pronged approach

The expropriation exception has four requirements, and Plaintiff must meet all of them to invoke it. §1605(a)(3) states that a foreign state is not immune from in any case:

> in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.

This exception only applies when there are: (1) property rights; (2) a recognizable "taking"; (3) a violation under international law; and (4) a commercial activity in the U.S. *Zappia,* 215 F.3d at 251. As Plaintiff cannot meet this burden, this Court must dismiss this case.

### i. *This case involves a property dispute*

The first prong is the only one Plaintiff satisfies because this case admittedly involves a property dispute. However, none of the other prongs apply, precluding this Court's jurisdiction.

### ii. *A "taking" was never committed because Italy never took possession of the Head*

The second prong requires a taking. Plaintiff claims that Italy assumed "control and dominion" over the Head through its "agent" to "permanently deprive" Plaintiff of its property. Am. Compl. ¶74, 76. This is untrue. The seizure was made by the DA, not Italy. Yet, even if Italy had seized the Head, it still would not constitute a taking. Private property rights are not absolute, and not every intervention of these rights is a taking. The Second Circuit repeatedly declines to expand the expropriation exception to this effect. *See Zappia,* 215 F.3d at 251.

Although the FSIA does not elaborate on what constitutes a taking, the legislative history explains that it was intended to revoke immunity for commercial acts. *Aboutaam v. L'Office Federale de la Culture de la Confederation Suisse,* No. 1:18-cv-08248 (RA), 2019 WL 4640083, at *3 (S.D.N.Y.  2019); *see also*

*Garb v. Rep. of Poland*, 440 F.3d 579, 585 (2d Cir. 2006). Expropriation of property is a sovereign act and qualifies for immunity, except when conducted in violation of international law, referring to "'the nationalization or expropriation of property without payment of the prompt adequate and effective compensation required by international law,' including 'takings which are arbitrary or discriminatory in nature.'" *Aboutaam* at *3, (citing *Zappia*, 215 F.3d 251 (quoting H.R.Rep. No. 19-1487, at *19-20 (1976))). Violation of international law requires "the taking not be for a public purpose, or... be discriminatory, or not accompanied by provision for just compensation." *Id.* at *3 (citing *Smith Rocke Ltd. v. Republica Bolivariana de Venezuela*, 12- CV-7316 (LGS), 2014 WL 288705, at *7 (S.D.N.Y. 2014)).

Plaintiff fails for a number of reasons. First, there was no physical taking; Plaintiff has not pled any facts indicating that Italy controls the Head. It was the DA who seized it. Contrary to Plaintiff's allegations, the DA's actions cannot be imputed to Italy because it is not and has never been an agent of Italy. (See Section II below). The only act taken by Italy was a phone call. A single call from a foreign agent is generally insufficient to create minimum contacts with the U.S., let alone constitute a taking in violation of international law. *Guevara v. Rep. of Peru*, 608 F.3d 1297, 1310 (11th Cir. 2010).

Second, even if Italy controlled the DA, there was still no taking. The DA does not claim an interest in the Head; rather, it was seized as part of an investigation. The seizing or freezing of assets during a criminal investigation does **not** qualify as a taking because it is temporary.[9] *See Chettri v. Nepal Rastra Bank,* 834 F.3d 50, 58 (2d Cir. 2016). Nor is it a violation of international law. In *Chettri*, the Nepali government froze the plaintiffs' assets for over two years during an investigation, and the Second Circuit held that the plaintiffs failed to establish there "was a taking, much less a taking in violation of international law." 834 F.3d at 58. Here, Plaintiff fails to demonstrate how the seizure of the Head pursuant to a valid warrant violates international law or constitutes a taking.

---

[9] Otherwise, possessors of illegal goods, such as drugs, would demand compensation for the deprivation of property.

A recent antiquities controversy is instructive here. In *Aboutaam*, an art dealer and a collector invoked the expropriation exception to sue Switzerland for its seizure of 12,000 antiquities. This Court held that plaintiffs did not overcome the presumption of immunity, explaining that a seizure as part of a criminal investigation serves a public purpose. *Aboutaam* at *4. It further held that the seizure was not arbitrary or discriminatory, because it resulted from a non-discriminatory basis: violation of Swiss law. Like here, the plaintiffs in *Aboutaam* made conclusory statements about an investigation, which were insufficient to invoke the expropriation exception. *Id.* at *5. Here, Plaintiff faces an even bigger hurdle; whereas Swiss officials seized the antiquities in *Aboutaam*, Italy never took possession of the Head or made the seizure.

Third, a seizure must not be arbitrary or discriminatory. The relevant inquiry is not the property holder's innocence, but the character of the government's action. *AmeriSource Corp. v. United States,* 525 F.3d 1149, 1154 (Fed. Cir. 2008). As in *Chettri* and *Hilsenrath v. Swiss Confed.*, 2007 WL 3119833 (N.D. Cal. 2007), authorities suspected illegal conduct related to the Head and the seizure was made as part of the DA's investigation under the PL. Here, as in *Aboutaam*, the Head was seized pursuant to a duly executed warrant, providing a non-discriminatory justification.

Finally, Plaintiff is not owed compensation. The Head was temporarily seized, not frozen for an "extended or indefinite period." *Aboutaam* at *4. As in *Chettri*, Plaintiff cannot cite any authority holding that a temporary freeze of assets during a criminal investigation constitutes a taking. *Chettri*, 834 F.3d at 58; *see also Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1331 (Fed. Cir. 2006) (For Fifth Amendment purposes, "[w]hen property has been seized pursuant to the criminal laws ... such deprivations are not 'takings' for which the owner is entitled to compensation."). Even if the Head is held for an undetermined period, that temporary seizure does not automatically vest ownership in a foreign country. *See Chettri*, 834 F.3d at 54.

Plaintiff claims the DA seized the Head solely to repatriate it to Italy. Am. Compl. ¶74. This completely misrepresents the DA's actions. The DA's mandate to seize stolen property and return it often

work in concert, but they are discrete functions. The authority for these functions is codified in separate statutes, signaling that the laws have distinct roles. The DA is obligated to seize property even without knowing its true owner, as N.Y. has an interest in preserving its art market. *See Bakalar v. Vavra*, 619 F.3d 136, 140-42 (2d Cir. 2010). Repatriation of the Head aside, its seizure benefits N.Y. by removing stolen goods from the market. Plaintiff asserts that the DA acts on behalf of Italy, but the DA was independently incentivized to take this action without involvement from any foreign sovereign.

Plaintiff fails to allege a physical taking, arbitrary or discriminatory acts, or acts that deprived it of compensation. Plaintiff's claims concern acts taken for a public purpose during a criminal investigation. Its jurisdictional claim fails as there was no taking under the FSIA.

### iii. *There was no violation of international law*

Asserting that Italy's phone call violates international law is frivolous. The Supreme Court strictly applies the expropriation exception only when a "violation of international law" occurs. *Helmerich*, 137 U.S. at 1312. Under principles of international law, Plaintiff cannot complain that a taking has violated international law "unless the claimant has first pursued and exhausted domestic remedies in the foreign state that is alleged to have caused the injury." *Aboutaam* at *5 (citing *Greenpeace, Inc. v. State of France*, 946 F. Supp. 773, 783 (C.D. Cal. 1996)). Here, Plaintiff did not pursue any remedy in Italy.

Plaintiff mentions several international legal instruments but does not specify how Italy violates them, and elusively claims there are more examples but never provides any. It is insufficient to make general statements that Italy breached legal obligations; Plaintiff must plead these with specificity. *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009). The vague references to customary international law and conventions in Am. Compl. ¶60 and 61 are not actionable.

### A. Italy meets its obligations under the 1970 UNESCO Convention

The illicit trade of cultural heritage is a global problem.[10] Nations face a Herculean challenge in protecting antiquities, leading Congress and the Executive Branch to cooperate with the 1970 UNESCO Convention (the "Convention"). The Convention was founded upon the recognition that "illicit import, export and transfer of ownership of cultural property is an obstacle."[11] Italy and the U.S. were among the first countries to ratify it, signifying their commitment to this issue.

Plaintiff claims Italy did not meet its obligations under Articles 5(d) & (g), but fails to plead any relevant facts. Art. 5(d) requires State Parties to "supervis[e] archaeological excavations, ensur[e] the preservation in situ of certain cultural property, and protect[] certain areas reserved for **future** archaeological research." (emphasis added). These obligations are prospective, not retroactive. Italy ratified the Convention in October 1978,[12] three years **after** the Head was sold in N.Y. Any failure to protect sites in Italy[13] after ratification does not affect Plaintiff and does not violate international law. Art. 5(g) requires Italy to publicize missing property, but it also does not apply because it came into effect after the 1974 sale in N.Y. The Convention does not require retroactive reporting, and does not require sovereign victims of theft to advertise crimes that occurred decades in the past.

Neither does Art. 7 apply as it requires Italy to prevent "museums and similar institutions" from acquiring "illicitly exported" items from **other** State Parties. The Head is from Italy, not another State Party. Similarly, Art. 7(b)(i) requires Italy to prohibit import of material "stolen from a museum or a religious or secular public monument or similar institution." The Head was not imported into Italy or stolen from another State Party's museum or "similar institution." Art. 7(b)(ii) is likewise inapplicable as

---

10 Blythe A. Bowman, *Transnational Crimes Against Culture: Looting at Archaeological Sites and the 'Grey' Market in Antiquities by Bowman*, 24 J. Contemp. Crim. Just. 225 (2008).

11 Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property 1970, Nov. 14, 1970, 823 U.N.T.S 231.

12 *Signatories to the Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property. Paris, 14 November 1970*, UNESCO, https://pax.unesco.org/la/convention.asp?KO=13039&language=E#1 (last visited Aug. 18, 2020).

13 We refute this allegation. Italy has gained international recognition for its commitment to the protection of archaeological sites and antiquities.

it concerns "property **imported after** the entry into force of this Convention in both States concerned."

Again, the Head was not imported **into** Italy, and it was in the U.S. in 1974 or earlier. The Convention

was in "force" in Italy as of October 2, 1978, and in "force" in the U.S. in 1983 after the ratification of

the Cultural Property Implementation Act ("CPIA"), 19 U.S.C. §2601-13. However, the CPIA only

implemented Arts. 7(b) and 9 of the Convention. Art. 7(b) is addressed in CPIA §2606 and 2607, which

state in relevant part:

> §2606(a): No ... material that is exported...from the State Party after the designation of such material under section 2604 of this title may be imported into the United States unless the State Party issues a certification or other documentation…

> §2607: No article of cultural property documented as appertaining to the inventory of a museum … in any State Party which is stolen from such institution after the effective date of this chapter, or after the date of entry into force of the Convention for the State Party, whichever date is later, may be imported into the United States.

Under CPIA §2604, "designated" material is covered pursuant to specific agreements with State

Parties, such as MOUs (see below). If designated material is imported into the U.S. in contravention of

the above, it is subject to seizure and forfeiture under CPIA §2609. Regarding compensation requirements

under §2609, it is essential to differentiate between §2606 and 2607, as only one requires compensation

to an alleged good faith owner:

> §2609(b): Any designated archaeological material which is imported into the United States in violation of section 2606 of this title and which is forfeited to the United States under this chapter shall - (1) first be offered for return to the State Party… [who shall bear] the expenses incurred incident to the return and delivery.

> §2609(c)(1): In any action for forfeiture… in violation of section 2607 of this title… where the claimant does not establish such title but establishes that it purchased the article for value without knowledge or reason to believe it was stolen, forfeiture shall not be decreed unless - (A) the State Party to which the article is to be returned pays the claimant an amount equal to the amount which the claimant paid for the article.

Only §2607 requires compensation, if the theft occurred after the latter of two dates: (i) the date

when Italy ratified the Convention (1978); or (ii) the entry of the CPIA (1983). This does not apply to the

Head because it was removed from Italy prior to both these dates. Far from failing to comply with its

obligations under the Convention, Italy consistently carries out steps to meet them.[14] Notably, by enacting the CPIA, the U.S. agreed to aid States Parties in recovering items. Plaintiff's claims as to the Convention are spurious.

### B. Communicating with the DA is not a violation of the Memorandum of Understanding ("MOU") between Italy and the U.S.

Italy and the U.S. have had a bilateral agreement, or MOU, in place since 2001, last approved by President Obama in 2016. It provides for cooperation and assistance in fighting the illicit trade of artifacts, signaling the U.S.' commitment to protecting heritage. Art. I of the 2001 MOU restricts the import of designated materials (the Head falls within this class of goods identified[15]) into the U.S., unless accompanied by documentation certifying legal exportation. Art. II recognizes efforts made by Italy to curb illicit exports. Art. II of the 2016 MOU supports Italy's actions here. Section 2(D) states that Italy shall "Strengthen, in whatever way necessary, the [TPC] and facilitate the exchange of information with competent agencies." Crucially, Sections I and J state that the U.S. and Italy agree to the following:

I.  ...encourage greater collaboration among law enforcement and members of the antiquities trade through **increased information sharing** for due diligence and research purposes in ways that do not jeopardize active criminal investigations. (emphasis added)

J. ...endeavor to engage proactively with such countries that have a demonstrable market or serve as transit points for archaeological objects from Italy to prevent the illicit trafficking of this material.

By communicating with the DA, Italy met its obligations under the MOU, as well as its national law and constitution. The TPC promptly contacted the DA after learning that the Head resurfaced in N.Y. It is difficult to say what else Italy should have done. Plaintiff makes two incompatible arguments; first arguing that the Head is not Italian and should not have been reported to the DA, and simultaneously alleging that Italy fails to comply with a treaty by not publicizing the theft. If foreign sovereigns contact

---

14 Frank Viviano, *Italy's Artifacts Police Wage Global War, Recover 137,000 Objects*, National Geographic (Jun. 19, 2015), https://www.nationalgeographic.com/news/2015/06/150618-carabinieri-morgantina-italy-art-theft-antiquities-trafficking/.

15 Import Restrictions Imposed on Archaeological Material Originating in Italy and Representing the Pre-Classical, Classical, and Imperial Roman Periods, 66 Fed. Reg. 7399 (Jan. 23, 2001).

sellers, they are accused of commercial activity, as in *Barnet v. Min. of Culture & Sports of the Hellenic Rep.*, 961 F.3d 193 (2d Cir. 2020) (plaintiffs sued Greece for contacting a private party). And if they use police channels, as required by the MOU, they are accused of expropriation. Italy's custodianship of heritage is an extension of its sovereign duties to protect it and hold items in trust for the public and for future generations.[16] It cannot sit idly by when stolen items appear on the market.

### C. A phone call between law enforcement agencies is not a violation of human rights

Plaintiff alleges a violation of the right to a fair trial under international law, but does not cite relevant instruments. Plaintiff refers to Arts. 10 and 17 of the Universal Declaration of Human Rights ("UDHR") and to the European Convention of Human Rights ("ECHR"), neither of which are enforceable in the U.S. While useful for interpreting international norms, the UDHR does "not itself create obligations enforceable in the federal courts." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 735 (2004); *see also Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 131 n.34 (2d Cir. 2010) (noting that the UDHR is a nonbinding resolution). Plaintiff also references Art. 1 of the ECHR, to which the U.S., not a member of the European Union, is not a party.

It is unclear why Plaintiff alleges violation of the right to a fair trial, which provides the right to an independent and impartial tribunal. Universal Declaration of Human Rights at art. 10, G. A. Res. 217A (III), U. N. Doc. A/810 (1948). Plaintiff has not litigated this matter in Italy, and so Italy never denied Plaintiff access to its court system. Further, Plaintiff has not alleged any facts that suggest Italy violated the right to a fair trial in the U.S. In the N.Y. Sup. Ct. litigation, Italy is not even a named party. Similarly, Plaintiff has not alleged any prejudicial act or biased ruling in this Court, which might serve as the basis for its claim

### D. Customary international law was not violated

---

16 "When the government possesses cultural property, it acts as trustee on behalf of the relevant cultural group for protecting and utilizing the object for the benefit of the group." Patty Gerstenblith, *Identity and Cultural Property: The Protection of Cultural Property in the United States*, 75 B.U. L. Rev. 559, 688 (1995).

A phone call to law enforcement is not, and has never been, a violation of international law. Communications about heritage are sovereign when they correspond to patrimony laws. *See generally Barnet*, 961 F.3d 193. U.S. courts recognize the validity of patrimony laws vesting ownership of antiquities in sovereign nations, even when affecting objects on U.S. soil, under the *McClain* doctrine.[17] *See United States v. McClain*, 545 F.2d 988, 1000-02 (5th Cir. 1977); *United States v. An Antique Platter of Gold*, 991 F.Supp. 222 (SDNY 1997). This type of legislation is inherently sovereign and deserving of comity.[18] Patrimony laws are not discriminatory because they apply to everyone equally, and do not constitute takings.[19]

Depriving Italy of immunity here would harm U.S. foreign policy and subject the U.S. to retaliatory treatment abroad. *See Helmerich,* 137 S.Ct. 1332; *Brief for the U.S. as Amicus Curiae* at 20-21, *Helmerich,* 137 S.Ct. 1312 (2017) (No. 15-423), 2016 WL 4524346 at *21-22. Here, the alleged taking (a phone call) does not rise to the level of genocide or similar action warranting interference with sovereign policing acts or foreign policy conducted by the Executive. The phone call was made pursuant to a patrimony law. It resulted in a warrant signed by a judge. The Second Circuit rejected the notion that a seizure violates international law whenever the property owner takes issue with the underlying investigation. *Chettri*, 834 F.3d at 58. Plaintiff cannot overcome this precedent and fails to establish a cogent violation of any international law.

### E. Plaintiff was afforded due process

Plaintiff bemoans the Head's seizure, alleging deprivation of due process and mistakenly contending that Italy is the perpetrator of such actions. Am Compl. ¶83. But at all times, the DA acted independently and followed protocol. Contrary to Plaintiff's unfounded allegation that the DA "chose"

---

[17]The McClain Doctrine is compatible with the Takings Clause and its underlying policies. *See* Patty Gerstenblith, *The Public Interest in the Restitution of Cultural Objects*, 16 Conn. J. Int'l L. 197, 239 (2001).
[18] Gerstenblith, *supra*, at 216.
[19] Patrimony laws confer ownership over heritage items to the State; it cannot expropriate from itself.

NY Sup. Ct. as a forum, Am. Compl. ¶28, the DA has no authority to forum shop, as the court is assigned by the Office of Court Administration. Affirm. at ¶8.

The Supreme Court explained that due process is not a fixed concept, but flexible according to each case. *See Matthews v. Eldridge*, 424 US 319 (1976). In *Matthews*, the Court formulated a balancing test for procedural due process. There are three factors: (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used; and (3) the government's interest. This test requires that deprivation of property must "'be preceded by notice and opportunity of a hearing appropriate to the nature of the case.'" *Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)). Here, Plaintiff was provided with notice and various opportunities to address the deprivation, including a full evidentiary hearing, which is generally not required to comply with due process. *See id.*, at 545.

It is shocking that Plaintiff alleges a due process violation when this case stems from a parallel litigation in state court where it was represented by the same counsel, provided with adequate notice of all proceedings, and appeared before an impartial judge. Plaintiff was provided with all evidence about the Head's link to criminal activity, regularly updated on the investigation, and participated in discovery (submitting and receiving answers to over 100 interrogatories). These are all hallmarks of due process, and it is erroneous and frivolous to contend a violation of the same.

Plaintiff does not cite facts to support conclusory statements. Plaintiff casts aspersions intimating that Italy and the DA are engaged in some type of nefarious collusion to deprive it of property. Am. Compl. ¶27-28. This stretches credulity. Plaintiff questions the DA's ability to unbiasedly perform his lawful functions and insinuates that the judge who signed the warrant and oversaw the state case fell under undue influence by the DA. If Plaintiff had concerns as to Justice Farber's impartiality (Am. Compl. ¶28), it should have requested a recusal. Rather, once the evidence appeared to favor the DA (after discovery was completed), Plaintiff filed this action. Plaintiff cannot reap the benefits of due process in state court and claim it was not met when instigating a federal suit predicated on the same facts.

15

**iv. There was no commercial activity as required under 1605(a)(3)**

Plaintiff must establish that one of the prongs of the fourth element of the expropriation exception is met. *Freund v. Rep. of France,* 592 F. Supp. 2d 540, 554 (S.D.N.Y. 2008). This requires that either: (a) the Head is present in the U.S. in connection with a commercial activity by Italy in the U.S.; or (b) the Head or property exchanged for it is owned or operated by an agency or instrumentality of Italy that is engaged in commercial activity in the U.S.

Determining which requirement applies depends on whether the defendant is the "foreign state" or its instrumentality. As recognized by the Second Circuit, the first clause "sets a higher threshold of proof for suing foreign states in connection with alleged takings by requiring that the property at issue be 'present in the United States.'" *Garb*, 440 F.3d at 589. Here, Plaintiff sued Italy. To establish jurisdiction, Plaintiff must therefore satisfy the "higher threshold" of 4(a) for claims against "foreign states." *Id.* at 590; *see also* H.R. Rep. No. 94-1487, at 19.

**A. Plaintiff cannot meet the commercial activity requirement articulated in 4(a) because the Head is not present in the U.S. in connection with commercial activity by Italy**

The Head is not in the U.S. because of any action by Italy. Plaintiff alleges a single act by Italy - a phone call. This is not commercial, but an extension of sovereign police power. *See generally Barnet*, 961 F.3d 193. In *Barnet*, Greece wrote to an auction house asserting rights under its patrimony law in an antiquity for sale, an act plaintiffs claimed was commercial. The Second Circuit unanimously disagreed, holding that asserting rights under a patrimony law is "archetypal" sovereign activity. *Id.* at 196. The court explained that nationalizing property is "distinctly sovereign," as is enforcing laws regulating the ownership and export of artifacts. *Id.* at 201 (citing *Nelson*, 507 U.S. at 362); *see also Garb,* 440 F.3d at 586, *Petersen Energía Inversora S.A.U. v. Argentine Rep.*, 895 F.3d 194, 201 (2d Cir. 2018)). As in *Barnet*, Italy made a communication about its patrimony law. But the acts here are even more clearly sovereign because Italy never contacted Plaintiff or a commercial entity. Rather, the TPC contacted the DA, a law enforcement authority. This is policing activity, a power that "has long been understood ... as

peculiarly sovereign in nature." *Barnet*, 961 F.3d at 201. Sharing information with government entities is essential to law enforcement and falls squarely within the established principle that the exercise of police power is sovereign. *Nelson*, 507 U.S. at 361-62.

Importantly, the Second Circuit never examined the validity of Greece's patrimony law, but reasoned that its enforcement is sovereign. *Barnet*, 961 F.3d at 202-203. A communication enforcing a patrimony law is sovereign based on the *mere existence* of the law: "[A]dopting its patrimony laws and insisting on compliance with those laws is enough to establish that its activity was sovereign rather than commercial." *Id.* at 201-02. The court warned, "litigation concerning the validity of a patrimony law requires the district court to evaluate the validity, scope, and application of patrimony laws—putting at issue precisely those sorts of sovereign acts for which sovereign nations enjoy immunity." *Id.* at 202-03. Likewise, the application of Italy's patrimony law is irrelevant for jurisdictional matters; and thus, it is beyond the scope of this Court's jurisdiction to examine its application. *See id.*

**B. Although inapplicable here, Plaintiff would also be unable to meet the less stringent requirement of 4(b) because the Ministry did not operate the Head**

The named defendant in this case is Italy, and thus 4(a) must be met. *See Freund*, 592 F. Supp. 2d at 562 (holding that plaintiffs could not fulfill 4(b) because France is not an agency or instrumentality of itself); *see also Garb*, 440 F.3d at 589. However, Plaintiff singles out the Ministry[20] in a flimsy attempt to meet the less stringent requirement of 4(b). Am. Compl. ¶5. The Ministry does not own the Head. It is owned by Italy because patrimony laws vest ownership in the sovereign, not its agencies. The Ministry also never operated the Head because that would require time-travel; the Ministry came into existence after the Head was removed from Italy. The Head left Italy before November 1974 (Am. Compl. ¶16), but the Ministry was not founded until December 1974. Regarding the Head's operation in the U.S., it was the DA who seized it as part of an investigation. This is not "operating" for purposes of the FSIA because

---

[20] The Complaint asserted actions by the Carabinieri, but the Amended Complaint now attributes those same acts to the Ministry.

it is not a taking or commercial act, but sovereign policing activity. Neither Italy nor its instrumentalities engaged in any commercial activity under the FSIA.

### 2.   Italy's phone call to the DA was not tortious

#### a.   Italy's Conduct Does Not Fall Within the Spirit of §1605(a)(5)

The "tort exception," 28 U.S.C. §1605(a)(5), provides jurisdiction for torts arising out of wrongful death, personal injury, or property rights where money damages are sought. *United Euram Corp. v. Union of Soviet Socialist Republics*, 461 F. Supp. 609, 612 (S.D.N.Y. 1978). Although "cast in general terms," the exception was "directed primarily to the problem of traffic accidents," and applies only to claims where "the negligent or wrongful act took place in the United States." Hearing on H.R. 3493 Before the Subcomm. on Claims & Gov't Relations of the H. Comm. on the Judiciary, 93d Cong., at 21 (1973). The legislative history and applicable case law make it clear that Italy's conduct falls outside the exception's scope. *See Robinson v. Gov't of Malay.*, 269 F.3d 133, 143 (2d Cir. 2001).

#### b.   Plaintiff Has Not Alleged a Tort Under §1605(a)(5)

The tort exception does not provide any substantive tort law to guide its interpretation, so courts look to applicable state law. *Robinson,* 269 F.3d at 143; *see also Swarna v. Al-Awadi*, 622 F.3d 123, 144 (2d Cir. 2010); *Amerada Hess*, 488 U.S. at 431. Plaintiff has not alleged a specific tort, but vaguely described Italy's conduct as "tortious." Am. Compl. ¶7, 63. Assuming the call between Italy and the DA is tortious, it nevertheless does not establish jurisdiction because it did not occur in the U.S. "Courts … have repeatedly interpreted the phrase 'occurring within the United States' to mean that the 'entire tort' must have occurred in the U.S." *Doe v. Fed. Democratic Rep. of Ethiopia*, 851 F.3d 7, 10 (D.C. Cir. 2017)("Kidane"); *see*, *e.g.*, *Jerez v. Republic of Cuba*, 775 F.3d 419, 424 (D.C. Cir. 2014) ("not only the injury but also the act precipitating that injury … must occur in the United States."); *Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1525 (D.C. Cir. 1984). Even if an "alleged tort may have had effects in the United States," the FSIA does not permit jurisdiction unless the tort occurred exclusively within the U.S. *Amerada Hess*, 488 U.S. at 441.

*Kidane* is instructive. Kidane, a U.S. citizen, sued Ethiopia for infecting his computer with spyware. The circuit court decided that because the alleged tort originated in Ethiopia, 28 USC § 1605(a)(5) did not apply; thus, Ethiopia retained its immunity. The Appellate Court affirmed, stating "Ethiopia's placement of the FinSpy virus on Kidane's computer, although completed in the U.S. ... began outside the U.S. It thus cannot be said that the entire tort occurred in the United States." *Kidane*, 851 F.3d at 10. This Court reached a similar conclusion in *Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410 (S.D.N.Y. 2019)("DNC"), where Russia was sued for hacks in connection with the 2016 election. §1605(a)(5) was inapplicable because the hacks were initiated abroad and therefore the alleged torts did not occur within the U.S. *DNC*, 392 F. Supp. 3d at 427. Italy's phone call originated in Italy; therefore, the entire tort did not occur in the U.S. Accordingly, §1605(a)(5) does not confer jurisdiction on this court.

### c.    Italy's Action Falls Within the Discretionary Exception

The tort exception also fails to establish jurisdiction because Italy's call falls within the exception to the exception, 28 U.S.C. §1605(a)(5)(A), providing that the FSIA does not confer jurisdiction for a "a claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused." Drawing on the Federal Tort Claims Act, the Second Circuit determined that "the discretionary function rule is designed to prevent judicial second-guessing of decisions grounded in social, economic, and political policy through the medium of an action in tort." *Swarna*, 622 F.3d at 146 (internal quotation marks omitted). Decisions made during a criminal investigation are "classic examples of discretionary conduct." *Sabow v. United States*, 93 F.3d 1445, 1452 (9th Cir. 1996); *see*, *e.g.*, *Arteaga-Ruiz v. United States*, 164 F. Supp. 3d 1198, 1203 (D. Idaho 2016) ("it is well established that decisions on how to investigate, who to investigate, and how to present evidence are considered discretionary conduct") (internal quotation marks omitted), *Hilsenrath,* 2007 WL 3119833 at *5 (freezing assets during criminal investigation fell within the discretionary function exception). Italy exercised discretion on how to enforce its patrimony law by informing the DA. Referring suspicion of a crime to authorities is a classic example of a discretionary decision made by law enforcement during an

19

investigation. The only action by Italy was a call between law enforcement agencies, squarely falling within §1605(a)(5)(A).

### 3.      The Republic of Italy never waived its sovereign immunity

Plaintiff vaguely references a waiver, but fails to explain how it applies. Am. Compl. ¶59. We assume it refers to the FSIA's waiver exception. 28 U.S.C. §1605(a)(1) states that a foreign sovereign is not immune from jurisdiction if it "has waived its immunity either explicitly or by implication." But "it is well-settled that a waiver of sovereign immunity must be clear, complete, unambiguous, and unmistakable in order to be effective." *Aquinda v. Texaco, Inc.*, 175 F.R.D. 50, 52 (S.D.N.Y. 1997), *vacated sub nom. Jota v. Texaco Inc.*, 157 F.3d 153 (2d Cir. 1998) (vacated on other grounds). There must be "an intentional and knowing relinquishment of the legal right." *See Walker Int'l Holdings Ltd. v. Rep. of Congo*, 395 F.3d 229, 234 (5th Cir. 2004). A waiver must be made by the foreign state and the relevant agency or instrumentality. *NML Capital, Ltd. v. Banco Central de la Republica Argentina*, 652 F.3d 172, 196 (2d Cir. 2011). Neither Italy nor its instrumentalities waived immunity. Further, implicit waivers must be narrowly construed and are found only when the waiver is absolutely clear. *Drexel Burnham Lambert Grp. Inc. v. Comm. of Receivers for Galadari*, 12 F.3d 317, 325 (2d Cir. 1993). Plaintiff fails to explain how immunity was waived through an "intentional and knowing relinquishment of the legal right." *Walker*, 395 F.3d at 234. Italy has not made a clear, complete, and unambiguous and unmistakable waiver of immunity. Appearing in court to request a dismissal is not a waiver. *Abelesz v. Magyar Nemzeti Bank,* 692 F.3d 661, 670 (7th Cir. 2012).

### 4.      Even if one of the FSIA exceptions applied, this matter is non-justiciable

Even if Plaintiff prevailed under the FSIA, this case must be dismissed under the political question doctrine. The U.S. government is based upon the separation of powers, and the judiciary is limited to reviewing cases that do not infringe upon the Executive or legislature. *See Baker v. Carr*, 369 U.S. 186 (1962). The political question doctrine requires a court to examine the consequences of a suit involving foreign relations. The analysis must consider whether the issue has been addressed by a political

20

department, and if it is feasible for a court to issue an independent resolution without infringing upon other government branches. *Baker,* 369 U.S. at 217. If a court contradicts decisions made by another political branch, it would interfere with governmental interests. *Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995). Political question analysis is made on a case-by-case basis and "reinforced by the historic deference due to the Executive" in U.S. foreign relations. *Whiteman v. Dorotheum GmbH & Co.*, 431 F.3d 57, 69-70 (2d Cir. 2003).

The Executive Branch is entitled to deference for foreign policy, including jurisdictional matters. *See Rep. of Austria v. Altmann*, 541 U.S. 688, 702 (2004). There has been an MOU between the U.S. and Italy since 2001. Exerting jurisdiction over Italy would contradict the MOU, which calls for cooperation in matters involving Italian heritage on U.S. soil. U.S. engagement in diplomatic efforts in this area bolsters the applicability of the political question doctrine. *See Freund*, 592 F.Supp. 2d at 568.

This case warrants dismissal under the political question doctrine. Invoking jurisdiction over Italy for exercising its sovereign policing power indicates lack of respect for Italy's constitutional and legal duties, as well as for President Obama's decision to enter into an MOU. This would contradict Supreme Court precedent. *See Baker*, 369 U.S. 186. The foreign policy interests asserted by the Executive Branch are due the utmost respect because they exemplify its constitutional duty to conduct foreign affairs. *See Whiteman*, 431 F.3d at 72; *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003).

## II.    PLAINTIFF NAMED THE WRONG PARTY; THE ACTS ALLEGED WERE NOT TAKEN BY ITALY, BUT BY THE DA[21]

This case stems from Plaintiff's misunderstanding of the function of a prosecutor's office and its role in preventing crimes, erroneously contending that the DA acted as Italy's agent. Am. Compl. ¶25. Plaintiff's causes of action all rely upon the mistaken belief that Italy's communication with the DA established an agency relationship. Am. Compl. ¶73-76.

---

[21] Plaintiff claims that it "was given express representations and warranties of the authenticity, ownership, export licensing, and other attributes of the provenance" from the seller of the Head, and that it relied on the same. Am. Compl. ¶9. We question Plaintiff's filing against Italy, rather than against the Head's sellers and their agents.

The DA's power was established *via* the N.Y. State Constitution in 1777 and N.Y. Consolidated Laws, County Law (Art. XXIII, N.Y. Const.: April 20, 1777; and N.Y. County Law §927), granting it a core representative function for the People of N.Y. The DA has a legal and constitutional duty to investigate and prosecute crimes. As a global financial capital, N.Y. is regularly exposed to criminal misconduct, including antiquities trafficking (falling within the scope of the PL). Here, the DA seized the Head after conducting an independent investigation which suggested it is the same item missing from Italy, making Plaintiff a possessor of stolen property in violation of Art. 165 of the PL.

The DA receives tips from several sources, but its investigations are all carried out in the same manner. Affirm. at ¶4. The DA may request information from informants to prosecute parties in violation of N.Y. laws[22] or an informant may contact the DA if it suspects stolen items are in N.Y. The DA then conducts an internal assessment. Affirm. at ¶3. Like any informant, the foreign sovereign does not direct the investigation, does not determine which cases to prosecute, and does not make determinations about N.Y. law enforcement procedures, such as seizures. Affirm. at ¶5. The DA's duty to act is not discretionary, but rather a legal <u>requirement</u> under N.Y. County Law §927.

The DA does not serve as an agent of or receive instructions from any foreign government. That is incompatible with its constitutional obligations. Furthermore, the DA has never been added as a party in a lawsuit on behalf of a foreign state. As a criminal prosecutor, the DA acts as an arm of N.Y. in a quasi-judicial capacity. *Baez v. Hennessy*, 853 F.2d 73, 77 (2d Cir. 1988). In addition, the DA is immune under the Eleventh Amendment, when appropriate. *See Baez*, 853 F.2d at 77; *Crespo v. Rivera*, No. 16 CIV. 708 (PGG), 2018 WL 4500868 (S.D.N.Y. 2018).

Plaintiff's allegation that the DA operates as Italy's agent is disconcerting. The DA did not seize the Head on behalf of Italy, but pursuant to its duty to protect N.Y. markets and consumers (*Tr.* at 30:18-32:1). Plaintiff implies a nefarious conspiracy between the DA, Italy, Justice Farber, and even Italy's

---

[22] *2016 Annual Report from the Office of New York County District Attorney Cyrus R. Vance, Jr.*, MANHATTANDA, https://www.manhattanda.org/wp-content/uploads/2018/02/2016-Annual-Report.pdf (last visited Jun. 20, 2020).

counsel.23 (Aff. of Leila A. Amineddoleh; attached as Ex. D.) This ignores the DA's transparency throughout the investigation and state court proceedings. In any event, this unfounded accusation has no bearing on this Court's FSIA analysis and is insufficient to obtain subject matter jurisdiction over Italy.

### III.   UPON DISMISSAL FROM THIS COURT, N.Y. SUP. CT. IS AVAILABLE TO SETTLE THE CONTROVERSY

Upon this Court's dismissal, the state court where the related dispute is stayed is the appropriate venue. *Tr.* at 28:23-24. Justice Farber said he "could do a civil proceeding, and [he] believes that [he does] have the jurisdiction to hold a civil proceeding." *Tr.* at 50:25-51:4. He noted that presiding over such a matter is "appropriate" in certain situations. *Tr.* at 51:13-14. CPL §10.10[7] bestows both criminal and civil jurisdiction on the N.Y. Sup. Ct.

Plaintiff falsely claims that Justice Farber found that this dispute should be heard in federal court. Am. Compl. ¶30. This is not true. During the November 13, 2019 hearing, Justice Farber recognized his ability to conduct a plenary case and make an ownership determination. *Tr.* at 28:19-21. He stayed the case not due jurisdictional concerns, but because of court congestion, noting his docket is "hundreds of times busier – than Southern District of New York." *Tr.* at 50:23-25. Justice Farber's stay was conditional upon this Court finding jurisdiction. *Tr.* at 52:16-20. It does not serve the judicial economy to permit this Court to hear the same controversy that Justice Farber has presided over for nearly two years.

As Justice Farber noted, there are instances in which the federal civil courts dismiss cases and return them to state court. Further, the DA confirmed it will pursue the matter in N.Y. Sup. Ct., if this Court dismisses the case. *Tr.* at 52:14-19. Plaintiff will be afforded the opportunity to be heard and due process will continue to be followed. As this Court does not have jurisdiction under the FSIA, this case must be dismissed, and the related matter should proceed in N.Y. Sup. Ct.

---

23 This is surprising seeing that Plaintiff's counsel told the press, in reference to an alleged meeting with Jeffrey Epstein, that he does not believe conspiracy theories. Dave Schechter, *Jeffrey Epstein Consulted Atlanta Attorney Days Before Death*, ATLANTA JEWISH TIMES (Dec. 23, 2019), https://atlantajewishtimes.timesofisrael.com/yir-jeffrey-epstein-consulted-atlanta-attorney-days-before-death/.

**IV.    IT IS AGAINST PUBLIC POLICY TO REQUIRE FOREIGN NATIONS TO DEFEND THEMSELVES IN U.S. COURTS FOR PROVIDING INFORMATION TO LAW ENFORCEMENT AGENCIES**

The legislative and judicial history of the FSIA notes that sovereign immunity is essential for international relations. *See Altmann*, 541 U.S. 688. And it is essential for nations to police their heritage. This case has implications beyond Italy—it is important for all mankind. For centuries, Italy[24] has suffered the widespread loss of its heritage.[25] Like many nations, including the U.S.,[26] preventing looting is overwhelming. Missing items often resurface in N.Y. because it is a major hub for art sales. See *People of the State of New York v. Weiner*, SCI-05191-2016 (Sup. Ct. 2016) (an antiquities dealer was arrested for possessing and conspiring to buy and sell looted artifacts transported into N.Y.); *United States v. Antique Platter of Gold*, 184 F.3d 131 (2d Cir. 1999) (authorities seized an antiquity illicitly removed from Italy and purchased by a N.Y. collector); *United States v. Schultz*, 333 F.3d 393 (2d Cir. 2003) (a N.Y. dealer was charged with conspiracy to receive stolen antiquities in violation of the National Stolen Property Act).

It is important that sovereigns communicate with law enforcement to prevent items from disappearing on the black market. Restricting communication would impair a sovereign's policing abilities and have repercussions for U.S. relations abroad. In fact, the U.S. Department of State and Italy entered into a mutual legal assistance treaty in 1982 with the express intention to "allow generally for the exchange of evidence and information in criminal and related matters."[27] This agreement reflects the cooperation between law enforcement agencies to "encourage foreign governments to cooperate in joint investigations." *Id.*

---

[24] Italy boasts 55 UNESCO World Heritage Sites, the highest number of any country. *Italy, Properties inscribed on the World Heritage List (55)*, UNESCO, https://whc.unesco.org/en/statesparties/it (last visited Jun. 20, 2020).

[25] *See* Viviano, *supra*.

[26] The U.S. struggles to protect Native American remains from unscrupulous collectors, even in light of Native American Graves Protection and Repatriation Act. Becky Little, *Why Graverobbers Won't Leave Native American Burial Sites Alone*, HISTORY (Mar. 4, 2019), https://www.history.com/news/native-american-burial-site-theft.

[27] *Treaties and Agreements*, U.S. DEPT. OF STATE (Mar. 7, 2012), https://2009-2017.state.gov/j/inl/rls/nrcrpt/2012/vol2/184110.htm.

On a local level, private buyers will be affected if foreign agencies are unable to contact law enforcement. Discouraging sovereigns from providing tips would wreak havoc on the market. Silencing victims or anyone with information would allow N.Y. to become a haven for stolen goods. Courts have long recognized that N.Y. "enjoys a worldwide reputation as a preeminent cultural center" and should not become a market for loot. *See Guggenheim v. Lubell*, 77 N.Y.2d 311, 320 (1991); *Bakalar*, 619 F. 3d at 140. To protect consumers, N.Y. courts adapted rules particular to art and artifacts, and N.Y. policy aims to preserve the integrity of transactions.

This Court and the Second Circuit have routinely chosen to protect consumers in cases of stolen heritage. For example, N.Y. crafted the Demand and Refusal Rule to toll statutes of limitations even when decades have passed since a theft. *See Kunstsammlungen zu Weimar v. Elicofon*, 678 F.2d 1150 (2d Cir. 1982) (tolling the statute of limitations in a dispute involving missing art from Germany that resurfaced decades later in N.Y.); *Republic of Turkey v. Metropolitan Museum of Art*, 762 F. Supp. 44 (S.D.N.Y. 1990) (decades after a hoard of antiquities went missing from Turkey and was acquired by the Metropolitan Museum of Art, the this Court rejected the defense that the statute of limitations expired because Turkey did not diligently locate the property).

Both individuals and agencies, domestic and foreign, should be encouraged to supply information about missing items and not desist from fear of retaliatory litigation. Without the ability to address these matters with policing authorities, illicit goods will thrive on the market. The DA must be able to effectively protect the People of N.Y. and carry out its legal functions. Without information provided by foreign agencies, the sale of stolen goods will go unchecked, N.Y. consumers will be subjected to unknowingly purchasing stolen property, and nations will have no channel to exercise their sovereign regulatory or policing powers. This does not uphold the purposes of the FSIA or comity.

**CONCLUSION**

This Court does not have subject matter jurisdiction over Italy under the FSIA because none of its enumerated exceptions apply. There must be a sufficient nexus and level of activity within the U.S. to require foreign sovereigns to defend themselves in U.S. courts. Situations in which the U.S. has denied immunity for an expropriation involve sovereigns perpetrating takings based on race or ethnicity or when a nation seizes property as part of genocide. A single communication between law enforcement agencies concerning missing property does not fall under any exception to the FSIA— it is not a taking in violation of international law with a nexus to commercial activity in the U.S. The channels used to enforce Italy's sovereign patrimony law were regulatory and policing in nature.

Italy's phone call to U.S. law enforcement was also not a tortious act. Furthermore, Italy never waived its sovereign immunity. Allowing Plaintiff to haul Italy into court would punish it for engaging in valid law enforcement duties and communicating with competent agencies in the U.S. and contradict long-standing U.S. policy respecting international grace and comity.

We respectfully pray for dismissal of the instant case. The interests of the People of N.Y., federally-established notions of grace and comity, and the concept of fairness require no less.

New York, New York Dated: August 19, 2020

**Amineddoleh & Associates LLC**
By: *s/ Leila A. Amineddoleh* Bar Number 1211
Leila A. Amineddoleh
Polina Ivko

43 West 43 Street, Suite 171
New York, NY 10036
Telephone: 212 709-8149
Leila@artandiplawfirm.com

*Attorneys for Defendant, La Repubblica Italiana*

26