UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------X

| | |
|---|---|
| Safani Gallery, Inc., | : |
| Plaintiff, | : Case No. 19-cv-10507 |
| -against- | : |
| The Italian Republic, | : |
| Defendant. | : |
| | : |
| | : |
| | : |

------------------------------X

**DEFENDANT'S INFORMATIVE MOTION REGARDING NEW LEGAL PRECEDENT**

Leila A. Amineddoleh
Polina Ivko
Amineddoleh & Associates LLC
43 West 43rd Street, Suite 171
New York, NY 10036
Attorneys for Defendant,
The Italian Republic

The Italian Republic ("Italy"), by and through its attorneys Amineddoleh & Associates LLC, hereby informs this Court of the following legal precedent issued by the United States Supreme Court on February 3, 2021, which has bearing on the instant case:

This week, the United States Supreme Court handed down a unanimous decision in *Federal Republic of Germany v. Philipp*, No. 19-351, 2021 WL 357254 (U.S. Feb. 3, 2021) (attached hereto as Exhibit A). In making its ruling, the Court also vacated a lower court ruling in a similar case, *Republic of Hungary v. Simon*, No. 18-1447, 2021 WL 357252 (U.S. Feb. 3, 2021), remanding it for further proceedings (attached hereto as Exhibit B).

In *Philipp*, the Court found that a narrow interpretation of the expropriation exception was "more consistent with the FSIA's express goal of codifying the restrictive theory of sovereign immunity." *Philipp*, 2021 WL 357254 at *7. The Court warned that adopting the plaintiffs' more expansive interpretation would incite reciprocal action in foreign courts, exposing Americans to hundreds of millions of dollars in potential liability, and offending one of the core functions of the FSIA— to preserve international comity. *Id.* at *9.

In its analysis, the U.S. Supreme Court explicitly acknowledged the FSIA's emphasis on differentiating between a State's public and private acts as a potential basis of liability. *Id.* at *7. While modern application of the FSIA has shifted away from the theory of absolute sovereign immunity, the Court expressed concern for maintaining this crucial distinction. *Id.* "It would destroy that distinction were we to subject all manner of sovereign public acts to judicial scrutiny under the FSIA by transforming the expropriation exception into an all-purpose jurisdictional hook for adjudicating" cases other than those contemplated in the FSIA. *Id.* at *8. While *Philipp* addresses alleged human rights violations under international law and whether they fall

within the scope of the FSIA, the Court's analysis is relevant for all cases concerning the expropriation exception, including the one presently before this Court.

Therefore, we respectfully request that this Honorable Court take notice of this new judicial precedent.

Respectfully Submitted,

/s/ Leila A. Amineddoleh
Leila Amineddoleh (Bar Number 1211)
Counsel for Defendant, The Italian Republic

## CERTIFICATE OF SERVICE

      I, Leila A. Amineddoleh, hereby certify that I have caused a true and accurate copy of the foregoing Defendant's Informative Motion Regarding New Legal Precedent to be served on all counsel of record by filing the same electronically through the Court's ECF system on this February 5, 2021.

/s/ Leila A. Amineddoleh
Leila A. Amineddoleh (Bar Number 1211)

**Amineddoleh & Associates LLC**
Leila A. Amineddoleh
Polina Ivko

43 West 43 Street
Suite 171
New York, NY 10036
Telephone: 212 709-8149

Leila@artandiplawfirm.com

*Attorneys for Defendant, La Repubblica Italiana*

# Exhibit A

2021 WL 357254
Only the Westlaw citation is currently available.
Supreme Court of the United States.

FEDERAL REPUBLIC OF
GERMANY, et al., Petitioners
v.
Alan PHILIPP, et al.

No. 19-351
|
Argued December 7, 2020
|
Decided February 3, 2021

**Synopsis**
**Background:** Heirs of German Jewish art dealers, who formed consortium to purchase collection of medieval relics, brought action against Federal Republic of Germany and its instrumentality that maintained the relics, asserting several common law property claims and seeking $250 million in compensation. The United States District Court for the District of Columbia, Colleen Kollar-Kotelly, J., 248 F.Supp.3d 59, denied motion to dismiss brought by Federal Republic of Germany and its instrumentality. Federal Republic of Germany and its instrumentality filed interlocutory appeal and moved to certify the order for immediate appeal. The District Court, Kollar-Kotelly, J., 253 F.Supp.3d 84, certified order for appeal. The United States Court of Appeals for the District of Columbia Circuit, Tatel, Circuit Judge, 894 F.3d 406, affirmed. The District Court, Kollar-Kotelly, J., 436 F.Supp.3d 61, granted motion brought by Federal Republic of Germany and its instrumentality to stay proceedings pending petition for writ of certiorari. Certiorari was granted.

**[Holding:]** The Supreme Court, Chief Justice Roberts, held that the phrase "rights in property taken in violation of international law," as used in the Foreign Sovereign Immunities Act's (FSIA) expropriation exception, refers to violations of the international law of expropriation and thereby incorporates the domestic takings rule, abrogating Simon v. Republic of Hungary, 812 F.3d 127.

Vacated and remanded.

**Procedural Posture(s):** Petition for Writ of Certiorari; On Appeal; Motion to Dismiss.

West Headnotes (11)

**[1]** **International Law** ⟶ Claims Assertable Against Foreign Sovereigns; Foreign Sovereign Immunity

The Foreign Sovereign Immunities Act (FSIA) supplies the ground rules for obtaining jurisdiction over a foreign state in the courts of the United States. 28 U.S.C.A. § 1602 et seq.

**[2]** **International Law** ⟶ Scope of Immunity; Nature of Claims Assertable

**International Law** ⟶ Presumptions and burden of proof

The Foreign Sovereign Immunities Act (FSIA) creates a baseline presumption of immunity from suit; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state. 28 U.S.C.A. § 1604.

**[3]** **International Law** ⟶ Property and Confiscation Thereof

The domestic takings rule assumes that what a country does to property belonging to its own citizens within its own borders is not the subject of international law. Restatement (Third) of Foreign Relations Law § 712 (1986).

**[4]** **International Law** ⟶ International Relations and Foreign Affairs

International law customarily concerns relations among sovereign states, not relations between states and individuals.

| | | |
|---|---|---|
| **[5]** | **International Law** ⬥ Act-of-state doctrine | |

The "act of state doctrine" prevents United States courts from determining the validity of the public acts of a foreign sovereign.

| | | |
|---|---|---|
| **[6]** | **International Law** ⬥ Scope of Immunity; Nature of Claims Assertable | |

A State is not deprived of immunity by reason of the fact that it is accused of serious violations of international human rights law.

| | | |
|---|---|---|
| **[7]** | **International Law** ⬥ Scope of Immunity; Nature of Claims Assertable | |

Under the absolute or classical theory of sovereign immunity, foreign sovereigns are categorically immune from suit; under the restrictive view, by contrast, immunity extends to a sovereign's public but not its private acts.

| | | |
|---|---|---|
| **[8]** | **International Law** ⬥ Purpose and construction in general | |

Supreme Court interprets the Foreign Sovereign Immunities Act (FSIA) as it does other statutes affecting international relations: to avoid, where possible, producing friction in United States' relations with other nations and leading some to reciprocate by granting their courts permission to embroil the United States in expensive and difficult litigation. 28 U.S.C.A. § 1602 et seq.

| | | |
|---|---|---|
| **[9]** | **International Law** ⬥ Works of art and other objects of cultural significance | |

The Foreign Cultural Exchange Jurisdictional Immunity Clarification Act amends the Foreign Sovereign Immunities Act (FSIA) to explain that participation in specified art exhibition activities does not qualify as commercial activity within the meaning of the FSIA's expropriation exception. 28 U.S.C.A. § 1605(a)(3).

| | | |
|---|---|---|
| **[10]** | **International Law** ⬥ Works of art and other objects of cultural significance | |

Claims concerning Nazi-era art takings can be brought under the Foreign Sovereign Immunities Act's (FSIA) expropriation exception where the claims involve the taking of a foreign national's property. 28 U.S.C.A. § 1605(a)(3).

| | | |
|---|---|---|
| **[11]** | **International Law** ⬥ Property taken in violation of international law; expropriation | |

The phrase "rights in property taken in violation of international law," as used in the Foreign Sovereign Immunities Act's (FSIA) expropriation exception, refers to violations of the international law of expropriation and thereby incorporates the domestic takings rule; abrogating *Simon v. Republic of Hungary*, 812 F.3d 127. 28 U.S.C.A. § 1605(a)(3).

*Syllabus*[*]

**\*1** Respondents are the heirs of German Jewish art dealers who formed a consortium during the waning years of the Weimar Republic to purchase a collection of medieval relics known as the Welfenschatz. The heirs allege that when the Nazi government rose to power, it unlawfully coerced the consortium into selling the collection to Prussia for a third of its value. The relics are currently maintained by the Stiftung Preussischer Kulturbesitz (SPK), an instrumentality of the Federal Republic of Germany, and displayed at a Berlin museum. After unsuccessfully seeking compensation in Germany, the heirs brought several common law property claims in United States District Court against Germany and SPK (collectively Germany). Germany moved to dismiss, arguing that it was immune from suit under the Foreign Sovereign Immunities Act. As relevant, Germany asserted

that the heirs' claims did not fall within the FSIA's exception to sovereign immunity for "property taken in violation of international law," 28 U.S.C. § 1605(a)(3), because a sovereign's taking of its own nationals' property is not unlawful under the international law of expropriation. The heirs countered that the exception did apply because Germany's purchase of the Welfenschatz was an act of genocide, and the relics were therefore taken in violation of international human rights law. The District Court denied Germany's motion to dismiss, and the D. C. Circuit affirmed.

*Held*: The phrase "rights in property taken in violation of international law," as used in the FSIA's expropriation exception, refers to violations of the international law of expropriation and thereby incorporates the domestic takings rule. Pp. ––– – –––.

(a) The heirs contend that their claims fall within the FSIA's exception for cases involving "property taken in violation of international law," § 1605(a)(3)—a provision known as the expropriation exception—because the forced sale of the Welfenschatz constituted an act of genocide, and genocide is a violation of international human rights law. Germany argues that the relevant international law is not the law of genocide but the international law of expropriation, under which a foreign sovereign's taking of its own nationals' property remains a domestic affair. Pp. ––– – –––.

(1) The "domestic takings rule" invoked by Germany derives from the premise that international law customarily concerns relations among states, not between states and individuals. Historically, a sovereign's taking of a foreign national's property implicated international law because it constituted an injury to the state of the alien's nationality. A domestic taking, by contrast, did not interfere with relations among states. This domestic takings rule endured even as a growing body of human rights law made states' treatment of individual human beings a matter of international concern. And those who criticized the treatment of property rights under international law did so on the ground that *all* sovereign takings, not just domestic takings, were outside the scope of that law. This dispute over the existence of international law constraints on sovereign takings eventually reached the Court in *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 436, 84 S.Ct. 923, 11 L.Ed.2d 804. Hesitant to delve into this controversy, the Court instead invoked the act of state doctrine. In response, Congress passed the Second Hickenlooper Amendment to the Foreign Assistance Act of 1964, which prohibits United States courts from applying the act of state doctrine where a "right[ ] to property is asserted" based upon a "taking ... by an act of that state in violation of ... international law." 22 U.S.C. § 2370(e)(2). Courts and commentators understood the Amendment to permit adjudication of claims *Sabbatino* had avoided deciding, *i.e.,* claims against other countries for expropriation of American-owned property. But nothing in the Amendment purported to alter any rule of international law, including the domestic takings rule. Congress used nearly identical language when it crafted the FSIA's expropriation exception twelve years later. Based on this historical and legal background, courts reached a "consensus" that the expropriation exception's "reference to 'violation of international law' does not cover expropriations of property belonging to a country's own nationals." *Republic of Austria v. Altmann*, 541 U.S. 677, 713, 124 S.Ct. 2240, 159 L.Ed.2d 1 (BREYER, J., concurring). Pp. ––– – –––.

**\*2** (2) The heirs concede that the international law of expropriation retained the domestic takings rule at the time of the FSIA's enactment, but they read "rights in property taken in violation of international law" to incorporate any international norm, including international human rights law, rather than merely the international law of expropriation. The text of the FSIA's expropriation exception, however, supports Germany's reading. The exception places repeated emphasis on property and property-related rights, while injuries and acts associated with violations of human rights law, such as genocide, are notably lacking—a remarkable omission if the provision was intended to provide relief for atrocities such as the Holocaust. A statutory phrase concerning property rights most sensibly references the international law governing property rights, rather than the law of genocide. The heirs' position would arguably force courts themselves to violate international law not only by ignoring the domestic takings rule, but also by derogating international law's preservation of sovereign immunity for violations of human rights law. Germany's interpretation of the exception is also more consistent with the FSIA's express goal of codifying the restrictive theory of sovereign immunity, 28 U.S.C. § 1602, under which immunity extends to a sovereign's public, but not

private, acts. It would destroy the Act's distinction between private and public acts were the Court to subject all manner of sovereign public acts to judicial scrutiny under the FSIA by transforming the expropriation exception into an all-purpose jurisdictional hook for adjudicating human rights violations. Pp. ––––  – ––––.

(3) Other FSIA provisions confirm Germany's position. The heirs' approach would circumvent the reticulated boundaries Congress placed in the FSIA with regard to bringing claims asserting human rights violations. One FSIA exception, for example, provides jurisdiction over claims "in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property," but only where the relevant conduct "occurr[ed] in the United States." § 1605(a)(5). And the FSIA's terrorism exception eliminates sovereign immunity for state sponsors of terrorism, but only for certain human rights claims, brought by certain victims, against certain defendants. §§ 1605A(a),(h). Such restrictions would be of little consequence if human rights abuses could be packaged as violations of property rights and thereby brought within the expropriation exception. Pp. ––––  – ––––.

(b) The heirs' counterarguments cannot overcome the text, context, and history of the expropriation exception. They claim that the 2016 Foreign Cultural Exchange Jurisdictional Immunity Clarification Act—which amends the FSIA to explain that participation in specified "art exhibition activities" does not qualify as "commercial activity" under the expropriation exception, § 1605(h)—demonstrates that Congress anticipated that Nazi-era claims could be adjudicated under the exception. Congress's effort to preserve sovereign immunity in a narrow, particularized context, however, does not support the broad elimination of sovereign immunity across all areas of law. Other statutes aimed at promoting restitution to Holocaust victims, on which the heirs rely, generally encourage redressing those injuries outside of public court systems and do not speak to sovereign immunity. See, *e.g.,* Holocaust Expropriated Art Recovery Act of 2016, 130 Stat. 1524. Pp. ––––  – ––––.

(c) This Court does not address Germany's argument that the District Court was obligated to abstain from deciding the case on international comity grounds or the heirs' alternative argument that the sale of the Welfenschatz is not subject to the domestic takings rule because the consortium members were not German nationals at the time of the transaction. Pp. ––––  – ––––.

894 F. 3d. 406, vacated and remanded.

ROBERTS, C.J., delivered the opinion for a unanimous Court.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

**Attorneys and Law Firms**

Jonathan M. Freiman, Counsel of Record, Tadhg Dooley, Benjamin M. Daniels, David R. Roth, Wiggin And Dana LLP, New Haven, CT, David L. Hall, Wiggin And Dana LLP, Philadelphia, PA, for Petitioners.

Nicholas M. O'Donnell, Erika L. Todd, Sullivan & Worcester LLP, Boston, MA, for Respondents.

**Opinion**

Chief Justice ROBERTS delivered the opinion of the Court.

The Foreign Sovereign Immunities Act provides that foreign nations are presumptively immune from the jurisdiction of United States courts. The statute, however, sets forth several specific exceptions. One such exception provides that a sovereign does not enjoy immunity in any case "in which rights in property taken in violation of international law are in issue." 28 U.S.C. § 1605(a)(3). The question presented is whether a country's alleged taking of property from its own nationals falls within this exception.

I

This case concerns several dozen medieval relics and devotional objects known as the Welfenschatz. The treasure ("schatz") of the German Welf dynasty, the pieces date back to the early days of the Holy Roman Empire and occupy a unique position in German history and culture. The collection was assembled within Germany's Brunswick Cathedral over the course of several centuries, before being moved to a

**Federal Republic of Germany v. Philipp, --- S.Ct. ---- (2021)**

Hanoverian chapel in 1671 and later to Switzerland for safekeeping in the wake of World War I.

*3 During the waning years of the Weimar Republic, a consortium of three art firms owned by Jewish residents of Frankfurt purchased the Welfenschatz from the Duke of Brunswick. By 1931, the consortium had sold about half of the collection's pieces to museums and individuals in Europe and the United States, including many to the Cleveland Museum of Art, where they reside today.

Conditions facing the consortium changed dramatically after the collapse of the German economy and the rise of the Nazi government. After ascending to power, Hermann Goering—Adolf Hitler's deputy and the Prime Minister of Prussia—became interested in the remainder of the Welfenschatz. The complaint alleges that he employed a combination of political persecution and physical threats to coerce the consortium into selling the remaining pieces to Prussia in 1935 for approximately one-third of their value. Two of the consortium members fled the country following the sale, and the third died in Germany shortly thereafter.

The United States took possession of the Welfenschatz in the course of the occupation of Nazi Germany at the end of the war, eventually turning the collection over to the Federal Republic of Germany. For nearly 60 years, the treasure has been maintained by Stiftung Preussischer Kulturbesitz (SPK)—the Prussian Cultural Heritage Foundation—and it is now displayed at a museum in Berlin. SPK is an instrumentality of the Federal Republic.

Respondents are two United States citizens and a citizen of the United Kingdom who trace their lineages back to the three members of the consortium. The heirs first approached SPK claiming that the sale of the Welfenschatz to the Prussian Government was unlawful. SPK conducted its own investigation of the sale and determined that the transaction occurred at a fair market price without coercion.

In 2014, the parties agreed to submit the claim to the German Advisory Commission for the Return of Cultural Property Seized as a Result of Nazi Persecution, Especially Jewish Property. Germany established the Advisory Commission under the Washington Conference Principles on Nazi-Confiscated Art, an initiative spearheaded by the United States to encourage the development of new mechanisms for resolving Nazi-era claims. See Brief for United States as *Amicus Curiae* 4. After hearing from expert witnesses and reviewing documentary evidence, the Commission likewise concluded that the sale had occurred at a fair price without duress.

Disappointed by the proceedings in Germany, the heirs filed suit in Federal District Court in Washington, D. C. They brought several common law property claims against Germany and SPK, seeking $250 million in compensation. Petitioners SPK and the Federal Republic of Germany—collectively Germany—moved to dismiss the case. Relevant here, Germany argued that it was immune from suit because the heirs' claims did not fall within the FSIA's exception to immunity for "property taken in violation of international law." See 28 U.S.C. § 1605(a)(3); see also § 1603(a) (defining "foreign state" to include "an agency or instrumentality of a foreign state"). In doing so, Germany reasoned that the purchase of the Welfenschatz could not have violated international law because a sovereign's taking of its own nationals' property is not unlawful under the international law of expropriation. The heirs responded that the exception did apply because Germany's purchase of the Welfenschatz was an act of genocide and the taking therefore violated the international law of genocide.

*4 The District Court denied Germany's motion, 248 F.Supp.3d 59, 70–74 (DDC 2017), and a panel of the D. C. Circuit affirmed, 894 F.3d 406 (2018). The panel agreed with the heirs that the exception for property taken in violation of international law was satisfied because "genocide perpetrated by a state even against its own nationals is a violation of international law." *Id.,* at 410–411 (quoting *Simon v. Republic of Hungary*, 812 F.3d 127, 145 (CADC 2016); alterations omitted). The D. C. Circuit declined Germany's request for en banc review. 925 F.3d 1349 (2019) (*per curiam*).

Judge Katsas dissented from the denial of rehearing en banc. In his view, the majority's analysis erroneously "ma[de] the district court sit as a war crimes tribunal to adjudicate claims of genocide," while "clear[ing] the way for a wide range of litigation against foreign sovereigns for public acts committed within their own territories." *Id.,* at 1350.

We granted certiorari. 591 U.S. ––––, 141 S.Ct. 185, 207 L.Ed.2d 1114 (2020).

II

[1] [2] Enacted in 1976, the Foreign Sovereign Immunities Act supplies the ground rules for "obtaining jurisdiction over a foreign state in the courts of this country." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). The Act creates a baseline presumption of immunity from suit. § 1604. "[U]nless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993).

[3] The heirs contend that their claims fall within the exception for "property taken in violation of international law," § 1605(a)(3), because the coerced sale of the Welfenschatz, their property, constituted an act of genocide, and genocide is a violation of international human rights law. Germany argues that the exception is inapplicable because the relevant international law is the international law of property—not the law of genocide—and under the international law of property a foreign sovereign's taking of its own nationals' property remains a domestic affair. This "domestic takings rule" assumes that what a country does to property belonging to its own citizens within its own borders is not the subject of international law. See *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. ––––, ––––, 137 S.Ct. 1312, 1320–1321, 197 L.Ed.2d 663 (2017) (citing Restatement (Third) of Foreign Relations Law of the United States § 712 (1986) (Restatement (Third))).

A

[4] Known at the founding as the "law of nations," what we now refer to as international law customarily concerns relations among sovereign states, not relations between states and individuals. See *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 422, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) ("The traditional view of international law is that it establishes substantive principles for determining whether one country has wronged another.").

The domestic takings rule invoked by Germany derives from this premise. Historically, a sovereign's taking of a foreigner's property, like any injury of a foreign national, implicated the international legal system because it "constituted an injury to the state of the alien's nationality." Bradley & Goldsmith, Customary International Law as Federal Common Law: A Critique of the Modern Position, 110 Harv. L. Rev. 815, 831, n. 106 (1997); see S. Friedman, Expropriation in International Law 5, 139 (1953). Such mistreatment was an affront to the sovereign, and "therefore the alien's state alone, and not the individual, could invoke the remedies of international law." Bradley, *supra,* at 831, n. 106. A domestic taking by contrast did not interfere with relations among states. See E. de Vattel, 3 The Law of Nations § 81, p. 138 (C. Fenwick transl. 1916) ("Even the property of individuals, taken as a whole, is to be regarded as the property of the Nation with respect to other Nations."); see also *United States v. Belmont*, 301 U.S. 324, 332, 57 S.Ct. 758, 81 L.Ed. 1134 (1937) ("What another country has done in the way of taking over property of its nationals ... is not a matter for judicial consideration here.").

*5 The domestic takings rule has deep roots not only in international law but also in United States foreign policy. Secretary of State Cordell Hull most famously expressed the principle in a 1938 letter to the Mexican Ambassador following that country's nationalization of American oil fields. The Secretary conceded "the right of a foreign government to treat its own nationals in this fashion if it so desires. This is a matter of domestic concern." Letter from C. Hull to C. Nájera (July 21, 1938), reprinted in 5 Foreign Relations of the United States Diplomatic Papers 677 (1956). The United States, however, could not "accept the idea" that "these plans can be carried forward at the expense of our citizens." *Ibid.*

The domestic takings rule endured even as international law increasingly came to be seen as constraining how states interacted not just with other states but also with individuals, including their own citizens. The United Nations Universal Declaration of Human Rights and Convention on the Prevention of Genocide became part of a growing body of human rights law that made "how a state treats individual human beings ... a matter of international concern."

**Federal Republic of Germany v. Philipp, --- S.Ct. ---- (2021)**

Bradley, *supra*, at 832 (quoting Restatement (Third), pt. VII, Introductory Note, at 144–145). These human rights documents were silent, however, on the subject of property rights. See Friedman, *supra,* at 107. International tribunals therefore continued to maintain that international law governed "confiscation of the property of foreigners," but "measures taken by a State with respect to the property of its own nationals are not subject to these principles." *Gudmundsson* v. *Iceland*, Appl. No. 511/59, 1960 Y. B. Eur. Conv. on H. R. 394, 423–424 (decision of the European Commission on Human Rights).

Some criticized the treatment of property rights under international law, but they did so on the ground that *all* sovereign takings were outside the scope of international law, not just domestic takings. In the 1950s and 1960s, a growing chorus of newly independent states, particularly in Latin America, resisted any foreign restraint on their ability to nationalize property. See Young, The Story of Banco Nacional de Cuba v. Sabbatino, in Federal Courts Stories 422–423 (V. Jackson & J. Resnik eds. 2010). Put differently, states and scholars disagreed over whether international law provided a remedy for a sovereign's interference with anyone's property rights, not whether domestic takings were outside the purview of international law. That principle was beyond debate.

**[5]** We confronted this dispute over the existence of international law constraints on sovereign takings in *Sabbatino*, where we were asked to decide claims arising out of Cuba's nationalization of American sugar interests in 1960. *376 U.S. at 403, 84 S.Ct. 923*. This Court observed that there were "few if any issues in international law today on which opinion seems to be so divided as the limitations on a state's power to expropriate the property *of aliens*." *Id.,* at 428, 84 S.Ct. 923 (emphasis added). Hesitant to delve into this controversy, we instead invoked the act of state doctrine, which prevents United States courts from determining the validity of the public acts of a foreign sovereign. *Id.,* at 436, 84 S.Ct. 923.

Congress did not applaud the Court's reticence. Within months of *Sabbatino*, it passed the Second Hickenlooper Amendment to the Foreign Assistance Act of 1964. The Amendment prohibits United States courts from applying the act of state doctrine where a "right[ ] to property is asserted" based upon a "taking ... by an act of that state in violation of the principles of international law." *22 U.S.C. § 2370(e)(2)*. Courts and commentators understood the Amendment to permit adjudication of claims the *Sabbatino* decision had avoided—claims against foreign nations for expropriation of American-owned property. But nothing in the Amendment purported to alter any rule of international law, including the domestic takings rule. See *F. Palicio y Compania, S.A. v. Brush,* 256 F.Supp. 481, 487 (SDNY 1966) (interpreting the Hickenlooper Amendment to displace *Sabbatino* but dismissing the suit on the ground that "confiscations by a state of the property of its own nationals, no matter how flagrant ..., do not constitute violations of international law"), summarily aff'd, *375 F.2d 1011 (CA2 1967)*; *Banco Nacional de Cuba v. Farr,* 383 F.2d 166, 173–176 (CA2 1967); Restatement (Second) of Foreign Relations Law of the United States § 185 (1965) (Restatement (Second)); Lillich, The Proper Role of Domestic Courts in the International Legal Order, 11 Va. J. Int'l L. 9, 29, 34 (1970).

**\*6** Congress used language nearly identical to that of the Second Hickenlooper Amendment 12 years later in crafting the FSIA's expropriation exception. As noted, it provides that United States courts may exercise jurisdiction over a foreign sovereign in any case "in which rights in property taken in violation of international law are in issue." *28 U.S.C. § 1605(a)(3)*.

Based on this historical and legal background, courts arrived at a "consensus" that the expropriation exception's "reference to 'violation of international law' does not cover expropriations of property belonging to a country's own nationals." *Republic of Austria v. Altmann,* 541 U.S. 677, 713, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004) (BREYER, J., concurring).

B

The heirs urge us to change course. They read "rights in property taken in violation of international law" not as an invocation of the international law governing property rights,

but as a broad incorporation of any international norm. Focusing on human rights law, the heirs rely on the United Nations Convention on Genocide, which defines genocide as "deliberately inflicting on [a] group conditions of life calculated to bring about its physical destruction in whole or in part." Convention on the Prevention and Punishment of the Crime of Genocide, Art. II, Dec. 9, 1948, 78 U. N. T. S. 277, 280. According to the heirs, the forced sale of their ancestors' art constituted an act of genocide because the confiscation of property was one of the conditions the Third Reich inflicted on the Jewish population to bring about their destruction.

We need not decide whether the sale of the consortium's property was an act of genocide, because the expropriation exception is best read as referencing the international law of expropriation rather than of human rights. We do not look to the law of genocide to determine if we have jurisdiction over the heirs' common law property claims. We look to the law of property.

And in 1976, the state of that body of law was clear: A "taking of property" could be "wrongful under international law" only where a state deprived "an alien" of property. Restatement (Second) § 185; see also *Permanent Mission of India to United Nations v. City of New York*, 551 U.S. 193, 199–200, 127 S.Ct. 2352, 168 L.Ed.2d 85 (2007) (noting our consistent practice of interpreting the FSIA in keeping with "international law at the time of the FSIA's enactment" and looking to the contemporary Restatement for guidance). As explained above, this rule survived the advent of modern human rights law, including the United Nations Convention on Genocide. Congress drafted the expropriation exception and its predecessor, the Hickenlooper Amendment, against that legal and historical backdrop. See *Taggart v. Lorenzen*, 587 U.S. ——, ——, 139 S.Ct. 1795, 1801, 204 L.Ed.2d 129 (2019).

The heirs concede that at the time of the FSIA's enactment the international law of expropriation retained the domestic takings rule. See Restatement (Second) § 192. But they argue that Congress captured all of international law in the exception—not just the international law of expropriation—and that other areas of international law do not shield a sovereign's actions against its own nationals. In support of that assertion, they note that the exception concerns "property *taken* in violation of international law"—not "property *takings* in violation of international law." Tr. of Oral Arg. 70. This distinction between "takings" and "taken," they say, is the difference between incorporating the specific international law governing takings of property and incorporating international law writ large. *Ibid.*

**\*7** We would not place so much weight on a gerund. The text of the expropriation exception as a whole supports Germany's reading. In its entirety the clause provides that United States courts may exercise jurisdiction over a foreign sovereign in any case

> "in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States." 28 U.S.C. § 1605(a)(3).

The exception places repeated emphasis on property and property-related rights, while injuries and acts we might associate with genocide are notably lacking. That would be remarkable if the provision were intended to provide relief for atrocities such as the Holocaust. A statutory phrase concerning property rights most sensibly references the international law governing property rights, rather than the law of genocide.

[6] What is more, the heirs' interpretation of the phrase "taken in violation of international law" is not limited to violations of the law of genocide but extends to any human rights abuse. Their construction would arguably force courts themselves to violate international law, not only ignoring the domestic takings rule but also derogating international law's preservation of sovereign immunity for violations of human rights law. As the International Court of Justice recently ruled when considering claims brought by descendants of citizens of Nazi-occupied countries, "a State is not deprived of immunity by reason of the fact that it is accused of serious violations of international human rights law." *Jurisdictional Immunities of the State* (*Germany* v. *Italy*), 2012 I. C. J. 99, 139 (Judgt. of Feb. 3); see also Bradley & Goldsmith, Foreign

Sovereign Immunity, Individual Officials, and Human Rights Litigation, 13 Green Bag 2d 9, 21 (2009). Respondents would overturn that rule whenever a violation of international human rights law is accompanied by a taking of property.

 [7]  Germany's interpretation of the exception is also more consistent with the FSIA's express goal of codifying the restrictive theory of sovereign immunity. § 1602. Under the absolute or classical theory of sovereign immunity, foreign sovereigns are categorically immune from suit. Altmann, 541 U.S. at 690, 124 S.Ct. 2240. Under the restrictive view, by contrast, immunity extends to a sovereign's public but not its private acts. Ibid. Most of the FSIA's exceptions, such as the exception for "commercial activity carried on in the United States," comport with the overarching framework of the restrictive theory. § 1605(a)(2).

It is true that the expropriation exception, because it permits the exercise of jurisdiction over some public acts of expropriation, goes beyond even the restrictive view. In this way, the exception is unique; no other country has adopted a comparable limitation on sovereign immunity. Restatement (Fourth) of Foreign Relations Law of the United States § 455, Reporters' Note 15 (2017).

 *8  History and context explain this nonconformity. As events such as Secretary Hull's letter and the Second Hickenlooper Amendment demonstrate, the United States has long sought to protect the property of its citizens abroad as part of a defense of America's free enterprise system. Sabbatino, 376 U.S. at 430, 84 S.Ct. 923.

Given that the FSIA "largely codifies" the restrictive theory, however, we take seriously the Act's general effort to preserve a dichotomy between private and public acts. Nelson, 507 U.S. at 359, 113 S.Ct. 1471 (internal quotation marks omitted). It would destroy that distinction were we to subject all manner of sovereign public acts to judicial scrutiny under the FSIA by transforming the expropriation exception into an all-purpose jurisdictional hook for adjudicating human rights violations. See Helmerich, 581 U.S., at ––––, 137 S.Ct., at 1320 (rejecting the suggestion that Congress intended the expropriation exception to operate as a "radical departure" from the "basic principles" of the restrictive theory).

C

Other provisions of the FSIA confirm Germany's position. The heirs' approach, for example, would circumvent the reticulated boundaries Congress placed in the FSIA with regard to human rights violations. Where Congress did target injuries associated with such acts, including torture or death, it did so explicitly and with precision. The noncommercial tort exception provides jurisdiction over claims "in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property," but only where the relevant conduct "occurr[ed] in the United States." § 1605(a)(5). Similarly, the terrorism exception eliminates sovereign immunity for state sponsors of terrorism but only for certain human rights claims, brought by certain victims, against certain defendants. §§ 1605A(a), (h).

These restrictions would be of little consequence if human rights abuses could be packaged as violations of property rights and thereby brought within the expropriation exception to sovereign immunity. And there is no reason to suppose Congress thought acts of genocide or other human rights violations to be especially deserving of redress only when accompanied by infringement of property rights. We have previously rejected efforts to insert modern human rights law into FSIA exceptions ill suited to the task. Nelson, 507 U.S. at 361, 113 S.Ct. 1471 (commercial activity exception does not encompass claims that foreign state illegally detained and tortured United States citizen, "however monstrous such abuse undoubtedly may be"). We do so again today.

 [8]  We have recognized that " 'United States law governs domestically but does not rule the world.' " Kiobel v. Royal Dutch Petroleum Co., 569 U.S. 108, 115, 133 S.Ct. 1659, 185 L.Ed.2d 671 (2013) (quoting Microsoft Corp. v. AT&T Corp., 550 U.S. 437, 454, 127 S.Ct. 1746, 167 L.Ed.2d 737 (2007)). We interpret the FSIA as we do other statutes affecting international relations: to avoid, where possible, "producing friction in our relations with [other] nations and leading some to reciprocate by granting their courts permission to embroil the United States in expensive and difficult litigation." Helmerich, 581 U.S., at ––––,

137 S.Ct., at 1322 (internal quotation marks omitted); *RJR Nabisco, Inc.* v. *European Community*, 579 U.S. ——, ——, 136 S.Ct. 2090, 2100, 195 L.Ed.2d 476 (2016) (interpreting civil Racketeer Influenced and Corrupt Organizations Act "to avoid the international discord that can result when U.S. law is applied to conduct in foreign countries"); *Kiobel*, 569 U.S. at 116, 133 S.Ct. 1659 (interpreting Alien Tort Statute so as not to "adopt an interpretation of U.S. law that carries foreign policy consequences not clearly intended by the political branches").

**\*9** As a Nation, we would be surprised—and might even initiate reciprocal action—if a court in Germany adjudicated claims by Americans that they were entitled to hundreds of millions of dollars because of human rights violations committed by the United States Government years ago. There is no reason to anticipate that Germany's reaction would be any different were American courts to exercise the jurisdiction claimed in this case.

### III

The heirs offer several counterarguments, but none can overcome the text, context, and history of the expropriation exception.

[9] First, the heirs rely on the 2016 Foreign Cultural Exchange Jurisdictional Immunity Clarification Act. The Act amends the FSIA to explain that participation in specified "art exhibition activities" does not qualify as "commercial activity" within the meaning of the expropriation exception. 28 U.S.C. § 1605(h). This clarification responded to decisions of federal courts holding to the contrary, see, *e.g.*, *Malewicz v. Amsterdam*, 362 F.Supp.2d 298, 313–315 (DDC 2005), and enables foreign states to loan art to American museums without fear that the work's presence in the United States will subject them to litigation here. The provision, however, does not apply to claims brought against Germany arising out of the period from January 1933 through May 1945. §§ 1605(h)(2), (3). According to the heirs, this clarification of the expropriation exception shows that Congress anticipated Nazi-era claims could be adjudicated by way of that exception.

[10] We agree with the heirs, but only to a limited extent. Claims concerning Nazi-era art takings could be brought under the expropriation exception where the claims involve the taking of a *foreign* national's property. See, *e.g.*, *Altmann*, 541 U.S. at 680–682, 124 S.Ct. 2240 (claim concerning Austrian taking of Czechoslovakian national's art brought under the expropriation exception). As for the heirs' suggestion that the Clarification Act demonstrates that Congress meant to abrogate immunity for any Nazi-era claim, however, we do not interpret Congress's effort to *preserve* sovereign immunity in a narrow, particularized context— art shows—as supporting the broad *elimination* of sovereign immunity across all areas of law. The Clarification Act did not purport to amend the critical phrase here—"taken in violation of international law"—and we will not construe it to do so.

The heirs also rely on other statutes aimed at promoting restitution to the victims of the Holocaust. The Acts include the Holocaust Victims Redress Act of 1998, 112 Stat. 15; the Holocaust Expropriated Art Recovery Act of 2016 (HEAR Act), 130 Stat. 1524; and the Justice for Uncompensated Survivors Today (JUST) Act of 2017, Pub. L. 115–171, 132 Stat. 1288. These laws, the heirs suggest, demonstrate Congress's desire for American courts to hear disputes about Holocaust-era property claims.

The statutes do promote restitution for the victims of the Holocaust, but they generally encourage redressing those injuries outside of public court systems. The HEAR Act, for example, states that "the use of alternative dispute resolution" mechanisms will "yield just and fair resolutions in a more efficient and predictable manner" than litigation in court. § 2(8), 130 Stat. 1525. Germany has adopted just such an alternative mechanism, the Advisory Commission, and the heirs availed themselves of that opportunity to resolve their claims. *Ibid.* See also Brief for Petitioners 5 ("[T]he German government has provided roughly $100 billion (in today's dollars) to compensate Holocaust survivors and other victims of the Nazi era.").

**\*10** These laws do not speak to sovereign immunity. That is the province of the FSIA, which provides the carefully constructed framework necessary for addressing an issue of such international concern. The heirs have not shown that the

FSIA allows them to bring their claims against Germany. We cannot permit them to bypass its design.

IV

[11] We hold that the phrase "rights in property taken in violation of international law," as used in the FSIA's expropriation exception, refers to violations of the international law of expropriation and thereby incorporates the domestic takings rule.

We do not address Germany's argument that the District Court was obligated to abstain from deciding the case on international comity grounds. Nor do we consider an alternative argument noted by the heirs: that the sale of the Welfenschatz is not subject to the domestic takings rule because the consortium members were not German nationals at the time of the transaction. See Brief for Respondents 27–28; but see Brief for Petitioners 19, n. 7 (claiming that the heirs forfeited this argument). The Court of Appeals should direct the District Court to consider this argument, including whether it was adequately preserved below.

The judgment of the Court of Appeals for the D. C. Circuit is vacated, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

**All Citations**

--- S.Ct. ----, 2021 WL 357254

**Footnotes**

\*  The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See _United States v. Detroit Timber & Lumber Co._, 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

# Exhibit B

Amineddoleh, Leila 2/5/2021
For Educational Use Only

**Republic of Hungary v. Simon, --- S.Ct. ---- (2021)**
2021 WL 357252

2021 WL 357252
Only the Westlaw citation is currently available.
Supreme Court of the United States.

REPUBLIC OF HUNGARY, et al., Petitioners

v.

Rosalie SIMON, et al.

No. 18-1447
|
February 3, 2021

**Opinion**

PER CURIAM.

*1  The judgment of the United States Court of Appeals for the D. C. Circuit is vacated, and the case is remanded for further proceedings consistent with the decision in *Federal Republic of Germany* v. *Philipp*, ––– U.S. ––––, ––– S.Ct. ––––, ––– L.Ed.2d ––––, 2021 WL 357254 (2021)

It is so ordered.

**All Citations**

--- S.Ct. ----, 2021 WL 357252 (Mem)

**End of Document**                              © 2021 Thomson Reuters. No claim to original U.S. Government Works.

© 2021 Thomson Reuters. No claim to original U.S. Government Works.                              1